Rita GRIFFIN, An Individual, Appellee

v.

UNIVERSITY OF PITTSBURGH MEDICAL CENTER–BRADDOCK HOSPITAL, Appellant.

Superior Court of Pennsylvania.

Argued March 18, 2008.
Filed May 19, 2008.
Reargument Denied July 17, 2008.

John C. Conti, Pittsburgh, for appellant.

Patrick J. DeMay, Bethel Park, for appellee.

BEFORE: BENDER, BOWES and TAMILIA, JJ.

OPINION BY BENDER, J.:

¶ 1 The University of Pittsburgh Medical Center—Braddock Hospital ("Hospital") appeals from the judgment entered in favor of Rita Griffin following a jury trial in this medical malpractice case. For the following reasons, we reverse.

¶ 2 The trial court set forth the following recitation of facts:

Plaintiff Rita Griffin presented to UPMC Braddock Hospital on August 20, 2003 complaining of abdominal discomfort off and on for the past several weeks. She had a history of Crohn's Disease. She was admitted for work-up and possible treatment. Testing revealed a possible mass involving the terminal ileum. On August 25, 2003, an exploratory laparotomy and ileocolectomy were performed. Post-operatively, Ms. Griffin exhibited some confusion and agitation in the early morning hours of August 26, 2003. Around 8:00 a.m. on August 26, 2003, Ms Griffin began to complain of right shoulder pain. She was diagnosed with a right posterior shoulder fracture/dislocation, which required open reduction and internal fixation with subscap transfer on August 29, 2003. She required three additional surgeries thereafter including a shoulder replacement and later revision thereof. Trial Court Opinion (T.C.O.), 5/31/07, at 1–2. According to her medical expert, Ms. Griffin has a permanently "dysfunctional shoulder" with decreased range of motion. Deposition of Kevin P. Speer, M.D. ("Speer Deposition"), 11/9/06, at 38–39. This results in a limited ability to do things involving "lifting her arm overhead, repetitive overhead activities, reaching out in front of her, [and] lifting anything heavy[.]" *Id.* at 40. Her ability to perform activities of daily living however, such as self-care, feeding, bathing and dressing, are not significantly impaired. *Id.* at 40–41.

¶ 3 Ms. Griffin commenced a medical malpractice action against Hospital by filing a praecipe for writ of summons on July 28, 2004, followed by the filing of a complaint on December 28, 2004. She averred that her shoulder injury could not have occurred absent negligence on the part of the agents, servants, or employees of Hospital. Complaint, 12/28/04, at ¶ 34.

¶ 4 A jury trial began on November 14, 2006. At trial, Ms. Griffin presented the videotaped testimony of her expert witness, Kevin P. Speer, M.D., an orthopedic surgeon and shoulder surgery specialist. Speer Deposition, at 9–10. As further explained below, Dr. Speer opined that Ms. Griffin's shoulder injury was caused either by a grand mal seizure (with "49%" certainty) or forcible restraint (with "51%" certainty), the latter of which would constitute negligence. On the other hand, Hospital presented the expert witness testimony of Mark Baratz, M.D., an orthopedic surgeon with additional training in shoulder, elbow, and hand surgery. Deposition of Mark Baratz, M.D., 11/15/06, at 5. Dr. Baratz opined, to a reasonable degree of medical certainty, that Ms. Griffin's shoulder injury was caused by a "classic nocturnal grand mal seizure" and not by forcible restraint. *Id.* at 27. He further opined that Ms. Griffin's documented amnesia, thrashing or agitation in bed, and the specific type of shoulder injury incurred were indicative of a grand mal seizure. *Id.* at 28, 31.

¶ 5 On November 17, 2006, the jury returned a verdict in favor of Ms. Griffin, awarding her damages in the amount of $2,277,131.00.[1] Hospital filed a motion for post trial relief on November 22, 2006. On February 27, 2007, the trial court entered an order denying Hospital's motion for post trial relief and entered judgment on the verdict in favor of Ms. Griffin.[2] Hospital filed a timely notice of appeal on March 16, 2007.

---

1. Of this amount, $2,250,000 was for noneconomic damages.

2. Later, on March 6, 2007, the court issued an order amending the judgment to $2,499,664.00.

¶ 6 Hospital sets forth the following "Statement of the Questions Involved" in its brief pursuant to Pa.R.A.P. 2116(a):

I. WHETHER JUDGMENT NOTWITHSTANDING THE VERDICT MUST BE GRANTED TO DEFENDANT WHERE PLAINTIFF'S EXPERT OFFERED HIS CAUSATION OPINION WITH 51 PERCENT PROBABILITY, THUS FAILING TO PROVIDE THE REQUISITE DEGREE OF MEDICAL CERTAINTY; AND WHERE THE ONLY POTENTIAL FACTUAL BASIS TO SUPPORT PLAINTIFF'S CAUSATION THEORY WAS A HEARSAY NOTE RULED INADMISSIBLE AT TRIAL, THUS RENDERING PLAINTIFF'S EXPERT'S PRE–RECORDED DEPOSITION TESTIMONY LACKING IN FOUNDATION?

II. WHETHER, IN THE ALTERNATIVE, A NEW TRIAL MUST BE GRANTED WHERE THE TRIAL COURT CHARGED THE JURY ON RES IPSA LOQUITUR, EVEN THOUGH PLAINTIFF'S EXPERT FAILED TO ESTABLISH THE INJURY AS ONE WHICH WOULD NOT OCCUR ABSENT NEGLIGENCE; FAILED TO ELIMINATE OTHER POSSIBLE CAUSES; AND ADDITIONALLY OFFERED A SPECIFIC THEORY OF NEGLIGENCE?

III. WHETHER, IN THE ALTERNATIVE, REMITTITUR MUST BE GRANTED WHERE THE JURY VERDICT DEVIATED SUBSTANTIALLY FROM WHAT COULD BE REASONABLE COMPENSATION?

Hospital's brief at 5 ("suggested answers" omitted).

¶ 7 First, Hospital argues that Ms. Griffin's expert witness, Dr. Speer, failed to render his opinion to the requisite degree of medical certainty. Accordingly, Hospital argues that the trial court erred by denying Hospital's motion for judgment notwithstanding the verdict (JNOV).

A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the jury could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. A JNOV should be entered only in a clear case.

*Buckley v. Exodus Transit & Storage Corp.*, 744 A.2d 298, 304–305 (Pa.Super.1999) (citations omitted).

Because medical malpractice is a form of negligence, to state a *prima facie* cause of action, a plaintiff must demonstrate the elements of negligence: "a duty owed by the physician to the patient, a breach of that duty by the physi-

cian, that the breach was the proximate cause of the harm suffered, and the damages suffered were a direct result of harm." With all but the most self-evident medical malpractice actions there is also the added requirement that the plaintiff must provide a medical expert who will testify as to the elements of duty, breach, and causation.

*Quinby v. Plumsteadville Family Practice, Inc.*, 589 Pa. 183, 907 A.2d 1061, 1070–71 (2006) (citations omitted). Thus, expert testimony is required in a medical malpractice case "where the circumstances surrounding the malpractice claim are beyond the knowledge of the average layperson[.]" *Vogelsberger v. Magee–Womens Hosp. of UPMC Health Sys.*, 903 A.2d 540, 563 n. 11 (Pa.Super.2006). The "plaintiff is . . . required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered." *Mitzelfelt v. Kamrin*, 526 Pa. 54, 584 A.2d 888, 892 (1990).

In determining whether the expert's opinion is rendered to the requisite degree of certainty, we examine the expert's testimony in its entirety. *Carrozza v. Greenbaum*, 866 A.2d 369, 379 (Pa.Super.2004) (citation omitted). "That an expert may have used less definite language does not render his entire opinion speculative if at some time during his testimony he expressed his opinion with reasonable certainty." *Id.* (citation omitted). Accordingly, an expert's opinion will not be deemed deficient merely because he or she failed to expressly use the specific words, "reasonable degree of medical certainty." *See Commonwealth v. Spotz*, 562 Pa. 498, 756 A.2d 1139 (2000) (indicating that "[i]n this jurisdiction, experts are not required to use 'magic words'" but,

rather, "this Court must look to the substance of [the expert's] testimony to determine whether his opinions were based on a reasonable degree of medical certainty rather than upon mere speculation"). Nevertheless, "[a]n expert fails this standard of certainty if he testifies 'that the alleged cause 'possibly', or 'could have' led to the result, that it 'could very properly account' for the result, or even that it was 'very highly probable' that it caused the result." *Eaddy v. Hamaty*, 694 A.2d 639, 642 (Pa.Super.1997) (citation omitted). *See also Corrado v. Thomas Jefferson Univ. Hosp.*, 790 A.2d 1022, 1031 (Pa.Super.2001) (finding expert opinion that defendant "more likely than not" deviated from standard of care insufficiently certain).

*Vicari v. Spiegel*, 936 A.2d 503, 510–11 (Pa.Super.2007) (footnote omitted). *See also McMahon v. Young*, 442 Pa. 484, 276 A.2d 534, 535 (1971) (concluding expert did not state opinion to requisite degree of certainty by testifying that defendant's negligence "probably" caused plaintiff's injury and noting that "the intent of our law [is] that if the plaintiff's medical expert cannot form an opinion with sufficient certainty so as to make a medical judgment, there is nothing on the record with which a jury can make a decision with sufficient certainty so as to make a legal judgment"); *Hoffman v. Brandywine Hosp.*, 443 Pa.Super. 245, 661 A.2d 397, 402 (1995) (concluding expert did not testify to requisite degree of medical certainty by rendering opinion that defendant's negligent treatment of HIV-positive patient *"in all likelihood* delayed the administration of antiviral medication which *may have hastened* the onset of opportunistic disease in [the plaintiff] and caused her illness to progress sooner than it might have").

¶ 8 With these principles in mind, we now examine the substance of Dr. Speer's trial testimony, which was actually his videotaped deposition testimony that was presented to the jury. Dr. Speer prefaced his testimony on direct examination with the generic statement that all of the opinions that he would be giving were stated to a "reasonable degree of medical certainty unless [he] state[d] otherwise[.]" Speer Deposition at 19. He went on to explain that the type of shoulder injury (a fracture dislocation injury) at issue was a "high energy injury" that "has a very limited number of [etiologies] that can cause it." *Id.* at 27. He opined to a "reasonable degree of medical certainty" that "thrashing about" in the bed, striking an arm against the bed rail, or falling out of bed onto an outstretched arm would not create the force necessary to inflict this type of shoulder injury. *Id.* at 27–28. Thus, he discounted those mechanisms as potential causes.

¶ 9 However, Dr. Speer did not discount, as a potential cause of the injury, a "violent complete or grand mal seizure." *Id.* at 29. He explained that these kinds of seizures involve "violent body thrashing and motions" and that the "shoulder can be injured in this manner." *Id.* He stated that he has seen this type of injury in patients from seizures and that it is "documented well in the literature." *Id.* He stated,

> the seizure causes it because the violence of the muscle contraction around the shoulder is so great that the shoulder is literally ripped out of its own socket by the body's own forces. That's the generally accepted mechanism about how that occurs. This is a most violent· type of seizure.... This possibility is

something that I considered as a possibility for her injury mechanism.
*Id.*

¶ 10 Then, Dr. Speer opined that the other potential cause of this injury was an altercation or interaction in which the patient sustains posterior directed force to the shoulder from attempts of being restrained. This is something I've seen in a police setting ... in that the person who sustains the injury is combative and resisting efforts to be restrained and the attempts to restrain damage and push the shoulder and the shoulder breaks and injures in this pattern.

*Id.* at 31. Dr. Speer stated that applying such force in a medical setting would be below the standard of care. *Id.* at 31–32. He summarized:

> One of two things occurred to this patient's shoulder. Either A, this patient had a violent seizure that was of such severity that the shoulder sustained this injury. Or B, the patient was combative, needed to be restrained, and in the efforts to do so the shoulder was injured.
>
> ... [I]t's one of these two mechanisms. And in looking at these two considerations and trying to discern through the record, they both have a void of support as to what happened. But I think that ... of these two possibilities I think that *the most likely,* which was the one that has the least void of evidence, would be a restraint attempt to the shoulder in the face the patient [sic] was combative or resisting such attempts.

*Id.* at 32–33 (emphasis added).[3]

¶ 11 Although Dr. Speer did utter the so-called "magic words," "reasonable de-

---

**3.** We also note, however, in his report of July 16, 2004, Dr. Speer indicated that the "most likely etiologic mechanism for this patient's shoulder posterior fracture dislocation is a seizure...." Dr. Speer's Report, 7/16/04, at 2. Nevertheless, contrary to Dr. Baratz's opin-

gree of medical certainty," cross examination shed further light on his opinion and revealed his misunderstanding of what is legally required to render an opinion to that degree. We set forth pertinent portions of this cross examination here:

Q. Dr. Speer, I do have some questions for you.

Am I correct, Dr. Speer, that you are unable to state, with reasonable medical certainty, whether Ms. Griffin's injury was caused by a seizure versus forcible restraint?

A. My answer to your question is not as—as simple as I would like for it to be. I think the two possibilities that could have created her shoulder injury [sic].

One of the two occurred. Unfortunately, there's a void of evidence or a lack of documentation to support either. I think that from a reasonable degree of medical certainty, that is choosing one or the other, a *fifty-one to forty-nine percent* consideration, I think that *the least implausible* consideration would be the—that she was restrained and had—her shoulder was injured in her attempts to be restrained because she was resisting that.

Q. So you're giving that the fifty-one percent?

A. I am, yes, sir.

*Id.* at 41–42 (emphasis added). He went on to admit that in his July 16, 2004 report, he stated as follows:

I think the most likely [etiologic] mechanism for this patient's shoulder posterior fracture dislocation is a seizure, in which she had a tetanic global shoulder muscle contraction that resulted in this severe, violent injury.... I have seen this mechanism of injury occurring from tetanic seizure activity from a variety of seizure mechanisms.

*Id.* at 43. He further admitted that the risk of seizure, although unlikely, is still increased in a post operative situation and that a seizure can last as little as twenty or thirty seconds and may not be noticed if no one is in the room. *Id.* at 44–45. Additionally, it is unlikely that a patient will remember having a seizure. *Id.* at 45. He conceded that, in Ms. Griffin's deposition, she stated that she had no recollection of the events that led to her shoulder dislocation and fracture. *Id.* at 46. He conceded that amnesia and confusion, as present in Ms. Griffin's situation, are sequelae of a seizure. *Id.* at 47. However, on re-direct examination, he stated that amnesia and confusion could likewise be

---

ion, Dr. Speer indicated that there was no documentation in the chart to indicate that Ms. Griffin had a seizure with the sole exception of a handwritten physical therapy assessment note indicating that Ms. Griffin's physical therapist "commented that the patient had a seizure on the day after surgery and the nurse had to forcibly kneel on her shoulder." *Id.* However, references to the information in that note were excluded following presentation to the court of one of Hospital's pretrial motions *in limine.* The court determined that the note constituted hearsay upon hearsay. Apparently, Ms. Griffin reported this information to her physical therapist after hearing it from her sister, who heard it from Ms. Griffin's roommate in the hospital, who could not

be contacted for her testimony or direct observations. Accordingly, Hospital argues, also within its first issue on appeal, that the trial court should have excluded Dr. Speer's "entire speculative causation testimony[,]" as it was premised on evidence that was later ruled inadmissible. Hospital's brief at 19. Nevertheless, we need not specifically address this argument, as we have concluded, as further described in the text of this opinion, that Dr. Speer's opinion that forcible restraint was the cause of the injury was not stated to the requisite degree of medical certainty—making the issue concerning whether this opinion may have been premised on inadmissible hearsay a moot one.

caused by her post operative medications. *Id.* at 55. In other words, as Dr. Speer stated, there was a void of evidence to support either potential cause.

¶ 12 Dr. Speer further admitted that, in his October 11, 2006 report, he did not state, with reasonable medical certainty, that the cause of her injury was forcible restraint over seizure. *Id.* at 50. Although he finally indicated, in his October 17, 2006 report, without receiving any new information, that the cause of her injury was forcible restraint, he reiterated his opinion that there was a 51% probability that the cause was forcible restraint over a 49% probability that the cause was a seizure. *Id.* at 53. He stated, on that basis, that restraint was the "more likely" cause. *Id.*[4]

¶ 13 Although Dr. Speer used the words "reasonable degree of certainty" in rendering his opinions, it became apparent from the totality and the substance of his entire testimony that he only actually opined that forcible restraint was more likely than seizure on a 51–49 basis, *i.e.,* a nearly equal basis. This degree of certainty is akin to an opinion stating that the alleged cause "could very properly account" for the injury or that it "more likely than not" caused the injury, both of which do not meet the requisite degree of medical certainty. *Corrado,* 790 A.2d at 1031; *Eaddy,* 694 A.2d at 642.

¶ 14 The Philadelphia Court of Common Pleas was faced with a similar issue in *Walsh v. Vivino,* 2005 WL 3839295 (Dec. 29, 2005), *aff'd,* 913 A.2d 955 (Pa.Super.2006) (unpublished memorandum). The plaintiff's expert testified to his opinion and understanding of the phrase, "reasonable degree of medical certainty." The court concluded that expert's opinion, stated to a "51%" degree of certainty, was akin to an opinion stated to a "more likely than not" degree of certainty, which is legally insufficient. Like Dr. Speer, it was apparent that the expert in *Walsh* mistakenly equated a 51% probability of causation to the higher, reasonable degree of medical certainty standard. The court stated:

> There can be no doubt that Appellant's expert ... was testifying as an expert and that his testimony was based upon an incorrect definition of reasonable degree of medical certainty; one that has been repeatedly held to be not sufficient for an expert testifying in a medical malpractice trial in the Commonwealth of Pennsylvania. At best, given the testimony of [the expert] and his repeated definitions of reasonable degree of medical certainty [referring to "51%"], the jury would be left to speculate as to just what the Commonwealth of Pennsylvania required of expert testimony.

*Id.* at *4. Thus, the *Walsh* court granted the defendant physician's motion for nonsuit.

¶ 15 In the instant case, despite Dr. Speer's use of any so-called "magic words," the substance and totality of his testimony did not support the proposition, to the legally requisite degree of certainty, that forcible restraint caused Ms. Griffin's shoulder injury. Rather, it appears that he rendered an opinion, to a "reasonable degree of medical certainty," that there was a 51% probability that negligent forcible restraint caused the injury over a nearly equal 49% probability that a nonnegligent factor, a seizure, caused the injury. This opinion does not equate to an opinion stating to a reasonable degree of medical certainty that negligent forcible

4. Although the trial court and Ms. Griffin contend that Dr. Speer "ruled-out" seizure as a cause of her injuries, this is not actually the case, as evidenced by Dr. Speer's opinion that there is a 49% probability that the injury was caused by seizure.

restraint caused Ms. Griffin's injury.[5] Accordingly, on this basis, we are compelled to reverse the judgment in favor of Ms. Griffin, and remand for the trial court to enter a JNOV in Hospital's favor, as Hospital is entitled to judgment as a matter of law because there was insufficiently competent expert evidence on the critical element of causation in Ms. Griffin's *prima facie* case of medical malpractice.

¶ 16 We also note that, since Dr. Speer's theory of causation is, to a nearly equal extent, forcible restraint (a negligent cause) as it is seizure (a non-negligent cause), it is, furthermore, apparent that allowing Ms. Griffin to proceed on a *res ipsa loquitur* theory of causation was also erroneous. Recently, our Court revisited the concept of *res ipsa loquitur* in *MacNutt v. Temple Univ. Hosp., Inc.*, 932 A.2d 980, 983 (Pa.Super.2007), an opinion that is instructive in the instant case.

¶ 17 In *MacNutt*, the plaintiff claimed that he suffered a chemical burn to the left side of his shoulder during an unrelated surgery. *Id.* He presented an expert witness who opined that the burn was caused by the plaintiff "lying in an unconscious state for an extended period of time in a surgical preparatory solution composed of Betadine and alcohol that pooled under his body." *Id.* (citation omitted). The plaintiff intended to support this theory of negligence by having his expert testify that a burn of that nature would not ordinarily occur in the absence of negligence. *Id.* On the other hand, the defendant hospital and physician offered expert testimony that the plaintiff's condition was not a burn at all but was, rather, an outbreak of shingles or herpes zoster. *Id.* at 984. The defendants posited that there was no evidence that Betadine pooled under the plaintiff's

shoulder and that Betadine could not cause a burn of the nature described by the plaintiff. *Id.* On appeal, the plaintiff argued that the trial court should have allowed him to proceed at trial on his theory of *res ipsa loquitur*. *Id.* at 985–86. We concluded that the trial court did not err. As we noted:

¶ 18 The Restatement (Second) of Torts § 328D provides:

§ 328D. *Res Ipsa Loquitur*

(1) It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when

(a) the event is of a kind which ordinarily does not occur in the absence of negligence;

(b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and

(c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.

(2) It is the function of the court to determine whether the inference may reasonably be drawn by the jury, or whether it must necessarily be drawn.

(3) It is the function of the jury to determine whether the inference is to be drawn in any case where different conclusions may reasonably be reached.

*Id.* at 986–87 (quoting RESTATEMENT (SECOND) OF TORTS § 328D). We further stated, "if there is any other cause to which with equal fairness the injury may be attributed (and a jury will not be permitted to guess which condition caused the injury), an inference of negligence will not be permitted to be drawn against defendant." *Id.* at

---

**5.** Perhaps Dr. Speer was confusing the standard applicable to a plaintiff's burden of proof in a civil case, *i.e.*, preponderance of the evidence, with the "reasonable degree of certainty" standard of certainty applicable to expert opinions.

987 (citation omitted).[6] On the record in *MacNutt*, we concluded, *inter alia*, that "[b]ecause the nature of the injury was itself in dispute [*i.e.*, negligent Betadine burn versus non-negligent herpes zoster outbreak], the [trial] court correctly determined the injury could have occurred without negligence[,]" and the plaintiff was "unable to eliminate other possible causes of [plaintiff's] injury." *Id.* at 990–91.

¶ 19 Similarly, in the instant case, Ms. Griffin could not sufficiently eliminate a non-negligent cause of her injury, even viewing Dr. Speer's testimony in the most favorable light. When he opined that there was a 49% (or almost equal) probability that her injury was caused by seizure, he essentially opined that seizure was another cause to which, with equal fairness, the injury may be attributed. Given this nearly equal division, the jury had to guess which condition caused the injury. Accordingly, an inference of negligence should not have been permitted to be drawn against Hospital on the record in this case. *Cf. Quinby*, 907 A.2d at 1072 (concluding *res ipsa loquitur* theory appropriate where there was "no factual issue or possible dispute" that quadriplegic patient's fall from examination table while unattended in physician's office resulted from "something other than Defendants'

negligence"). *See also Grandelli v. Methodist Hosp.*, 777 A.2d 1138, 1147 (Pa.Super.2001) ("[A] review of the relevant case law reveals that *res ipsa loquitur* is not often applied in medical malpractice actions; except in the most clear-cut cases, *res ipsa loquitur* may not be used in a medical malpractice action to ... shortcut the requirement that causation be established within a reasonable degree of medical certainty.").

¶ 20 For the foregoing reasons, we are compelled to reverse the judgment entered in favor of Ms. Griffin and remand to the trial court for entry of a JNOV in favor of Hospital.

¶ 21 Judgment reversed. Jurisdiction relinquished.

¶ 22 Judge TAMILIA concurs in the result.

---

6. We also recognize, as Ms. Griffin points out, that

> [t]he plaintiff need not ... conclusively exclude all other possible explanations, and so prove his case beyond a reasonable doubt.... *It is enough that the facts proved reasonably permit the conclusion that negligence is the more probable explanation. This conclusion is not for the court to draw, or to refuse to draw, in any case where either conclusion is reasonable; and even though the court would not itself find negligence, it must still leave the question to the jury if reasonable men might do so.*

Sedlitsky v. Pareso, 400 Pa.Super. 1, 582 A.2d 1314, 1316 (1990) (quoting RESTATEMENT (SECOND) OF TORTS, cmt. e (emphasis added)) (concluding plaintiff met prongs (a) and (b) of *res ipsa loquitur* requirements where plaintiff presented evidence that injury normally occurs only because of negligence and provided sufficient evidence that no other responsible causes exist). Even so, as stated above, where "there is any other cause to which with equal fairness the injury may be attributed ..., an inference of negligence will not be permitted to be drawn against defendant." *MacNutt*, 932 A.2d at 987. The record in the instant case is more in-line with the *MacNutt* case to the extent that Ms. Griffin's own expert's testimony attributed seizure as a cause on an essentially equal paring with forcible restraint as a cause.