J-A18009-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| RACHEL IMSCHWEILER AND JARED IMSCHWEILER, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | |
| ILENE KATZ WEIZER, M.D., JAMES XENOPHON, M.D. AND A WOMAN'S CARE OB-GYN, P.C., | : | |
| | : | |
| Appellees | : | No. 1680 MDA 2013 |

Appeal from the Order entered on August 27, 2013
in the Court of Common Pleas of Schuylkill County,
Civil Division, No. S-218-2010

BEFORE: LAZARUS, WECHT and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:               **FILED SEPTEMBER 16, 2014**

Rachel Imschweiler ("Rachel") and Jared Imschweiler ("the Imschweilers") appeal from the Order[1] denying their Post-Trial Motion in their negligence case against Ilene Katz Weizer, M.D. ("Dr. Katz Weizer"), James Xenophon, M.D. ("Dr. Xenophon"), and A Woman's Care Ob-Gyn, P.C. ("the Practice") (collectively, "Defendants"). We reverse and remand for a new trial.

---

[1] Generally, an appeal will only be permitted from a final order unless otherwise permitted by statute or rule of court. *Johnston the Florist, Inc. v. TEDCO Constr. Corp.*, 657 A.2d 511, 514 (Pa. Super. 1995). An appeal from an order denying post-trial motions is interlocutory. *Id.* However, in *Johnston the Florist*, this Court, regarding as done that which ought to have been done, considered the merits of the appeal. *Id.* at 514-15. Although the Imschweilers purportedly appeal from the Order denying their Post-Trial Motion, pursuant to *Johnston the Florist*, we will consider the appeal as being properly before this Court.

The trial court summarized the relevant history underlying the instant appeal as follows:

> On August 14, 2009, [Rachel] gave birth to a healthy 9 pound 4 ounce boy. After a lengthy labor, the baby was delivered through a C-Section at 11:25 p.m. by Dr. Katz[]Weizer. The [Imschweilers] found no fault with Dr. Katz[]Weizer's prenatal care or her care of [Rachel] during the delivery.
>
> Following the birth, [Rachel] was taken to the hospital's intensive care unit (ICU), which doubles as a recovery room on weekends. Initially, [Rachel] did well post-operatively, but shortly before 1:00 a.m. on August 15, 2009, her blood pressure began to drop.
>
> [All parties] agreed that [Rachel] had developed a condition known as uterine atony. … [T]his condition occurs when a woman's uterus loses tone and fails to properly contract. Normally, the contraction of the uterus after birth serves to slow down the flow of blood from the uterine blood vessels, which provide copious amounts of blood to the placenta during the pregnancy. When the uterus fails to contract, the blood continues to flow and the patient bleeds vaginally.
>
> A sure way to stop the bleeding would have been for Dr. Katz[]Weizer to perform a hysterectomy, removing [Rachel's] uterus; but [Rachel] was still young and wanted to preserve her ability to have more children if at all possible. Unfortunately, by early afternoon that day, her uterus was removed at the Lehigh Valley Hospital [("the Hospital"),] where she had been transferred at Dr. Katz[]Weizer's request. Her ovaries were left intact ….

Trial Court Opinion, 8/27/13, at 1-2.

The Imschweilers filed the instant negligence action against Defendants. After a one-week trial, the jury found in favor of the Defendants. The Imschweilers filed a Motion for judgment notwithstanding

the verdict or a new trial, which the trial court denied. Thereafter, the Imschweilers filed the instant timely appeal.

The Imschweilers present the following claims for our review:

A. Whether the trial court erred in ruling that [the Imschweilers'] expert testimony did not satisfy the causation element of their cause of action with respect to the theories of delay in returning to surgery, delay in transfer to a tertiary care center, or delay in obtaining interventional radiology services by [] Dr. Katz Weizer[?]

B. Whether the trial court erred in removing disputed facts on the issue of causation from the jury's consideration[?]

C. Whether the trial court erred in ruling that [the Imschweilers] were precluded from arguing the increased risk of harm causation theory in closing argument, based solely on comments during closing argument and without objection by defense counsel[?]

D. Whether the trial court erred in ruling that Defendant[s'] medical expert satisfied the requirements [of] 40 Pa.C.S.[A.] § 1303.512, in finding that Defendant[s'] medical expert was qualified to testify on standard of care issues[?]

Brief of Appellants at 5.

The Imschweilers' first two claims challenge the trial court's entry of nonsuit as to their negligence claim based on Dr. Katz Weizer's unreasonable delays in returning Rachel to surgery, transferring Rachel to a tertiary care facility, and seeking interventional radiology services, thereby increasing the risk that Rachel would lose her uterus. *Id.* at 15. Specifically, the Imschweilers challenge the trial court's determination that the testimony of their expert witness was speculative. *Id.* According to the Imschweilers, they presented expert testimony sufficient to establish that Dr. Katz Weizer

increased the risk of harm by not returning Rachel to surgery by 3:30 a.m.

*Id.* The Imschweilers argue that the evidence established that the delay in returning Rachel to surgery and the subsequent delay in transferring her to a tertiary care facility "took away any opportunities for the physicians at Lehigh Valley Hospital to salvage her uterus, thus increasing the risk of harm." *Id.* According to the Imschweilers, the trial court's ruling improperly granted nonsuit as to their claim of negligence based upon the alleged delays. *Id.* at 16.

"A trial court may enter a compulsory nonsuit on any and all causes of action if, at the close of the plaintiff's case against all defendants on liability, the court finds that the plaintiff has failed to establish a right to relief." *Scampone v. Highland Park Care Ctr., LLC*, 57 A.3d 582, 595 (Pa. 2012).

> Whether in a particular case that standard [plaintiff's burden of preponderance of the evidence] has been met with respect to the element of causation is normally a question of fact for the jury; the question is to be removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue. In establishing a [*prima facie*] case, the plaintiff need not exclude every possible explanation …; it is enough that reasonable minds are able to conclude that the preponderance of the evidence shows defendant's conduct to have been a substantial cause of the harm to plaintiff.

*Hamil v. Bashline*, 392 A.2d 1280, 1284-85 (Pa. 1978); *accord Summers v. Certainteed Corp.*, 997 A.2d 1152, 1163 (Pa. 2010).

Because medical malpractice is a form of negligence, to state a *prima facie* cause of action, a plaintiff must demonstrate

a duty owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered, and the damages suffered were a direct result of harm. With all but the most self-evident medical malpractice actions there is also the added requirement that the plaintiff must provide a medical expert who will testify as to the elements of duty, breach, and causation.

*Griffin v. Univ. of Pittsburgh Med. Center-Braddock Hosp.*, 950 A.2d 996, 999-1000 (Pa. Super. 2008). The plaintiff proves the duty and breach elements by showing that the defendant's act or omission fell below the standard of care and, therefore, increased the risk of harm to the plaintiff. *Thierfelder v. Wolfert*, 52 A.3d 1251, 1264 (Pa. 2012).

Regarding expert testimony, we observe that

[a]n expert witness proffered by a plaintiff in a medical malpractice action is required to testify[,] to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered. However, expert witnesses are not required to use "magic words" when expressing their opinions; rather, the substance of their testimony must be examined to determine whether the expert has met the requisite standard. Moreover, in establishing a *prima facie* case, the plaintiff [in a medical malpractice case] need not exclude every possible explanation of the accident; it is enough that reasonable minds are able to conclude that the preponderance of the evidence shows the defendant's conduct to have been a substantial cause of the harm to [the] plaintiff.

*Stimmler v. Chestnut Hill Hosp.*, 981 A.2d 145, 155 (Pa. 2009) (citations and some internal quotation marks omitted).

Regarding the Imschweilers' theory of liability based upon increased risk of harm, this Court has observed that "direct causation and increased risk of harm are not mutually exclusive, but simply alternative theories of

- 5 -

recovery which, depending on the facts and the expert testimony, may both apply in a given case." ***Klein v. Aronchick***, 85 A.3d 487, 494 (Pa. Super. 2014). "A plaintiff is entitled to an instruction on increased risk where there is competent medical testimony that a defendant's conduct at least increased the risk that the harm sustained by the plaintiff would occur." ***Id.*** at 495.

Our review of the record discloses that at trial, the Imschweilers presented the expert testimony of Victor Borden, M.D. ("Dr. Borden"). Dr. Borden testified that the first problem arose, after the C-section delivery of Rachel's child, around 1:00 a.m. N.T., 5/15/13, at 524. Dr. Borden testified that in trying to remove blood and clots from Rachel's uterus, Dr. Katz Weizer first tried fundal massage. ***Id.*** at 527. Dr. Borden described the procedure and its purpose as follows:

> [W]hat you're trying to do is you're trying to get that uterus to clamp down, to cramp down. When it's got things inside, it's less likely to do that. So if there's bleeding and … blood clots, the clots stay there. So if you've got lots of clots within the cavity of the uterus, it's even less likely to clamp down. And so you want to evacuate those clots. You want to massage, we call it fundal massage the uterus from the abdomen. And you're massaging the uterus, getting out as much of the blood as you can because what you want is you want that uterus to clamp down and stay clamped down.

***Id.*** at 526. Dr. Borden confirmed that from 2:20 a.m. to 3:30 a.m., the procedure was done three times, and by 6:00 a.m., the procedure had been done six times. ***Id.*** at 526-27. According to Dr. Borden,

if it's not working after two or three times, it's not going to work for you to continue just to do that. And also, every time you're doing this, the patient's awake. You're … manipulating the patient. And it's very, very uncomfortable. … Your hand is in the vagina trying to get those clots all the way up from as high up, very uncomfortable, very painful. And if it's not working within two to three times, it's not going to work to continue to do it. You have to do something else.

*Id.* at 527. Dr. Borden opined that **by 3:30 a.m.**,

the decision should have been made that [Dr. Katz Weizer] had to go in and do the surgery that she did, you know, two and a half hours or so later. That would have prevented less blood loss to continue and hopefully would have ended the situation had it been done without a laceration occurring. Again, as I say, the laceration is a risk of that procedure. But it should have been noted and should have been identified at that time and repaired. **But that procedure that she ultimately did at around 6:00 in the morning should have been done around 3:30 to 4:00 in the morning.**

*Id.* at 527-28 (emphasis added).

Dr. Borden further testified as follows:

Q. [The Imschweilers' counsel]: Doctor, did the delays as you describe by Dr. Katz[]Weizer in taking Rachel [] back to surgery, did those delays affect the chances of saving her uterus?

A. [Dr. Borden]: Yes.

Q. And how so?

A. Just add the time, time—I mean, so much time is lost in terms of doing what was done after the initial diagnosis of postpartum hemorrhage was made. Ultimately, by the time she left Schuylkill to get to another institution that could more likely than not be a better place to help her, it was too late for them to do anything but to remove her uterus. **Had the procedure been done sooner, had there been the identification of the laceration, I think the problem would have been ended by the B-Lynch and no further issues as far as bleeding from a laceration. But if she continued bleeding, she needed to**

- 7 -

**be gotten out of here much sooner to a tertiary care center where they would have had the ability to do more and potentially save her uterus.**

…

Q. You told us earlier that at the point in time that [Orion A. Rust, M.D. ("Dr. Rust"),] took over the care of this patient, I believe your words were he was essentially out of time. Why was he out of time at that point?

A. This patient had been hemodynamically unstable for hours. She had just been airlifted after multiple hours in an institution here where the postpartum hemorrhage could not be treated and solved. I think, as I mentioned before, she had twice the volume of a human being's blood volume transfused. By so much blood loss, by so much blood replacement, there was no time for Dr. Rust to do anything.

Fearful of disseminated intravascular coagulopathy would have been foremost on his mind or should have been foremost on his mind as well besides the fact that she was hemodynamically, had been hemodynamically unstable for such a period of time.

Q. Doctor, the failure to detect the laceration during the laparotomy procedure at 6:00 a.m., did that have an effect on whether Rachel[']s uterus could be saved?

A. Yes.

Q. And how so?

A. It allowed for continued bleeding to occur. And until that laceration was either repaired or until the uterus was removed, she would have continued bleeding.

Q. In other words –

A. Nothing else would have worked at that point in time.

…

**Q. … Did the delay between the exploratory laparotomy and Dr. Rust taking this patient to surgery and the delay in getting Rachel [] back to surgery at Schuylkill Medical Center as you discussed, did that delay increase the risk that her uterus would be lost?**

…

**[A.] Yes.**

…

Q. And how so?

A. **The delay ultimately gave Dr. Rust no other option but to remove her uterus.** All of that length of time that had gone by had, as I said, [*sic*] so much blood loss, so much manipulation to the uterus, all of that, by the time he got her at Lehigh Valley, his concern was basically to save her life. And the only way … that he could do that for certain to stop the bleeding, that it wouldn't continue regardless of what would have been to remove her uterus, which was where the bleeding was coming from. There was no other option he had by the time he took control of [Rachel's] life.

Q. Now, had Dr. Rust gotten this patient sooner than he did, sooner than 1:00 p.m., approximately the next day, what could he have done? What would have been done for [her] at a tertiary care center?

…

[A.] **Again, with her arriving at Lehigh hours earlier, he could have, when he opened her, had much greater time to identify, to look at all of the contents of the pelvis and to define this laceration and then repair it and see what happened[,] to see whether the bleeding stopped at that point in time. That's all that it might have taken.**

I think without identification of that laceration, I don't think that an interventional radiologist at Lehigh Valley would have been successful in stopping the bleeding. I think the bleeding would have continued because of the laceration. So the only thing would have been for him to reopen her and take his

- 9 -

time and effort to check everything out at that time before removing the uterus had she not had all those blood transfusions, had she not had all of those hours spent bleeding.

*Id.* at 540-42, 554-56 (emphasis added). Dr. Borden further opined that

Dr. Katz[]Weizer initially handled the beginning of the postpartum hemorrhage within a standard of care. But within an hour or so with no control, with continued postpartum care, [*sic*] delayed accepted medical treatment allowed a situation to progress and develop and worsen.

Ultimately, Dr. Katz[]Weizer decided she needed to operate on [Rachel] again. **That decision should have been made several hours earlier than it was.** During the procedure, I believe a laceration occurred that was not recognized at the time by both Dr. Katz[]Weizer and Dr. Xenophon that should have been. And, also, I believe there was a prolonged delay in transferring the patient --- [.]

*Id.* at 510 (emphasis added).

Dr. Borden also testified as follows regarding the delay in transferring

Rachel to a tertiary care facility:

This patient continued bleeding from somewhere around 1 o'clock the morning on and on and on. And nothing that was done to try to stop the bleeding was successful. And this patient should have been transferred much earlier than she was from Schuylkill Medical Center to a receiving hospital that was more capable in taking care of that problem at that point in time. The longer the delay, the more risk to the patient and ultimately what I think was the loss of her uterus that could have been avoided had she been transferred out sooner.

*Id.* at 515-16. Dr. Borden opined that,

because of the continued delay both in the initial exploration to try to stop the bleeding because of the failure to recognize the laceration and repair it, the hemorrhage continued. The patient lost more than twice the volume of her blood, her total blood. More than twice of that was lost because that's at least what they replaced. So her situation was extremely critical.

> I think by the time she was transferred to Lehigh Valley, there was nothing else that could have been done to save her life other than to remove the uterus. I think Dr. Rust quickly, as quickly as possible, explored the patient and removed her uterus as quickly as possible to save her life….

*Id.* at 517-18. Dr. Borden rendered his opinion within a reasonable degree of medical certainty. *Id.* at 557.

Carol Miller-Schaeffer, M.D. ("Dr. Schaeffer"), testified that she was contacted for a consult as to Rachel's condition. N.T., 5/14/13, at 370. Dr. Schaeffer stated that upon arriving at the ICU at Schuylkill Hospital, sometime after 10:00 a.m., the morning after Rachel's C-Section, she observed that Rachel was still bleeding. *Id.* at 374. According to Dr. Schaeffer, "blood was pretty much running out [of Rachel] as fast as we could put it in." *Id.* at 375. At the time that Dr. Schaeffer saw Rachel, Rachel had received 11 units of blood, two units of frozen plasma, and 10 plus liters of IV fluid. *Id.* at 379-80. Dr. Schaeffer testified as to her concern that Rachel could develop a coagulopathy. *Id.* at 387. Ultimately, Dr. Schaeffer recommended to Dr. Katz Weizer that Rachel be transferred to a tertiary care facility:

> It was my opinion at that point that the patient was bleeding. The fact that her blood counts were dropping, her platelet count was dropping, her coagulation studies were getting worse, that her condition could continue to deteriorate. I did not feel that I nor the hospital was equipped to care for her any further. There are not experts at the hospital available at all times to care for somebody whose condition continues to deteriorate and, therefore, it was my recommendation that she went to a tertiary

- 11 -

care center where there were more specialists available to deal with problems should they worsen.

*Id.* at 392. Dr. Schaeffer further stated that, "I think at that point the situation had deteriorated further that even if it was a hysterectomy, that's what was needed to be done to save [Rachel's] life." *Id.* at 395.

Dr. Rust, the surgeon who ultimately performed a hysterectomy on Rachel, testified that upon Rachel's arrival at Lehigh Valley Hospital, he discussed with her the treatment options available:

> The options that we talked about and when she first came in is that first we discussed her condition, that she was in a serious but stable condition and if she continued to bleed, that a hysterectomy would most likely be indicated. And the reason for that is invasive radiology procedures can only be done if you have two main things: The time to do them and the people to do them.
>
> …
>
> And at that particular time, I was uncertain about both as far as the time because if she continued to bleed, then there wouldn't be time. And if there was—and I had to see if our invasive people—this is a Saturday morning. Usually they're around, but I have to check and make sure … that they don't have another patient that they're working on. Or if they did, then to see if another crew was available—I needed to check on the time and the personnel.

N.T. 5/16/13, at 821. According to Dr. Rust, he discussed with Rachel his intention to save her uterus, if possible:

> That would have been ideal, if possible. And the key to that is how much more bleeding she was going to be doing. Right now, she was serious but stable. **But in cases of uterine atony or prolonged vaginal bleeding, that there can be more bleeding and we were already in serious condition**.

- 12 -

*Id.* at 822 (emphasis added). However, Dr. Rust testified that he made the decision to conduct a hysterectomy very shortly thereafter:

> It actually was a pretty short time because I met her in the emergency room, did the physical exam, went over the case with Dr. Galic, who was my assistant that day. And literally, before we finished her discussion, [Rachel] started to bleed significantly again.

*Id.* Dr. Rust explained to Rachel that

> I was concerned that if we waited any longer or if we tried to do any other procedures, that her health and status at that time could deteriorate and that she was in danger of serious harm or death.

*Id.* at 822-23.

We note that Dr. Rust also testified that the laceration could not have been seen without conducting a hysterectomy. *Id.* at 832. However, Dr. Borden testified that the laceration was an extension of the C-Section incision. N.T., 5/15/13, at 534. Dr. Borden opined that the laceration was in an area that could have been detected during the exploratory laparotomy. *Id.* at 535. Dr. Borden testified that the ligament would not have obstructed the ability to detect the laceration:

> Not throughout the entire length of this laceration because it emanated from where the Cesarean scar—I shouldn't say scar— the Cesarean incision was done. That's not covered by the broad ligament. The area right continuing from that is not covered by the broad ligament.

*Id.* at 537.

Based upon the foregoing, we conclude that Dr. Rust's testimony, and the contradictory testimony of Dr. Borden, do not support the entry of

nonsuit as to the issue of delay. As the trial court stated in its Opinion, "[c]redibility issues are for the jury, not for an expert to resolve." Trial Court Opinion, 8/27/13, at 23; *see Griffin*, 950 A.2d at 999 (stating that, "[c]oncerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact").

Our review discloses that the Imschweilers presented sufficient evidence for a jury to evaluate whether Dr. Katz Weizer's delay in returning Rachel to surgery and in transferring Rachel to a tertiary care facility deviated from the standard of care and increased the risk of a hysterectomy. Accordingly, the trial court erred in entering nonsuit as to the Imschweilers' theory of liability based upon increased risk of harm resulting from these delays. Therefore, we reverse the entry of nonsuit, and remand for a new trial as to the theories of liability premised upon the delay in returning Rachel to surgery and in transferring Rachel to a tertiary care facility.

The Imschweilers also advanced an increased risk of harm theory of liability based upon Dr. Katz Weizer's delay in seeking an interventional radiologist. Our review of the record discloses that the Imschweilers failed to present *prima facie* evidence that Dr. Katz Weizer's delay in seeking an interventional radiologist increased the risk of harm to Rachel. Dr. Borden, the Imschweilers' expert, testified regarding this issue as follows:

> I think without the identification of the laceration, I don't think
> that an interventional radiologist at Lehigh Valley would have
> been successful in stopping the bleeding. I think the bleeding
> would have continued because of the laceration. So the only

thing would have been for [Dr. Rust] to reopen her and take his time and effort to check everything out at that time before removing the uterus had she not had all those blood transfusions, had she not had all those hours of time spent bleeding.

N.T., 5/15/13, at 556. Accordingly, as to this theory of liability, the trial court's entry of nonsuit was proper.

The Imschweilers next claim that the trial court erred in removing disputed issues of fact from the jury's consideration. Brief of Appellants at 32. According to the Imschweilers, they presented evidence supporting their theories of liability

that Dr. Katz Weizer negligently delayed in returning [Rachel] to a surgery by 3:00 a.m. on August 15[,] and negligently delayed transferring [Rachel] to a tertiary care center in view of the postpartum hemorrhage and that these delays took away any opportunity for the physicians at Lehigh Valley Hospital to salvage her uterus....

*Id.* This issue implicates the trial court's entry of nonsuit as the theory of liability based upon the increased risk of harm caused by Dr. Katz Weizer's delays.

As set forth above, we conclude that the trial court improperly granted nonsuit as to the theories of liability premised upon the delays. Accordingly, we need not separately address this claim.

The Imschweilers next claim that the trial court erred in precluding them from arguing "increased risk of harm" during closing arguments. Brief of Appellants at 36. The Imschweilers state that during their closing

argument, the trial court interrupted and called for a conference with all counsel. *Id.* According to the Imschweilers,

> [t]he [trial c]ourt advised that it was not going to charge the jury on the increased risk of harm causation theory as counsel had argued to the jury that only the laceration was causing the bleeding following the exploratory laparotomy[,] and not a combination of atony and the laceration. The [trial c]ourt improperly based its ruling on the content of closing argument, not on any new evidence presented by a witness.

*Id.*

As set forth above, we are remanding this matter for a new trial on the issue of increased risk of harm. Accordingly, we need not address this claim.

In their next claim, the Imschweilers argue that the trial court erred in ruling that defense expert Nancy Roberts, M.D. ("Dr. Roberts"), was competent to testify on medical standard of care issues, in violation of the Medical Care Availability and Reduction of Error Act ("MCARE"), 40 P.S. § 1303.512. Brief of Appellants at 38. According to the Imschweilers, on cross-examination, Dr. Roberts testified that she last performed a delivery in November 2005, last performed a B-Lynch suturing procedure in 2004, and last performed surgery of any kind in 2005. *Id.* The Imschweilers point out Dr. Roberts's testimony that she supervised a small number of medical students from a local medical school. *Id.* Finally, the Imschweilers direct our attention to Dr. Roberts's testimony, on cross-examination, that her practice has been limited to performing ultrasounds four days a week, and

performing administrative duties one day a week. *Id.* Because Dr. Roberts's qualifications do not meet the qualifications for expert testimony mandated by section 512(b)(2) of MCARE, the Imschweilers claim, the trial court erred in deeming Dr. Roberts qualified as a medical expert on standard of care and causation. Brief of Appellants at 31.

"Decisions regarding admission of expert testimony, like other evidentiary decisions, are within the sound discretion of the trial court. We may reverse only if we find an abuse of discretion or error of law." *Weiner v. Fisher*, 871 A.2d 1283, 1285 (Pa. Super. 2005).

MCARE section 512 provides, in relevant part, that

[a]n expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:

…

> (2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.

(c) Standard of Care.- In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care must also meet the following qualifications:

> (1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

- 17 -

> (2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).
>
> (3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

40 P.S. § 1303.512(b), (c).

In its Opinion, the trial court explained its decision to accept Dr. Roberts's qualifications as follows:

> Dr. Roberts had neck surgery[,] which has prevented her from delivering babies or performing hysterectomies since 2005, but she consults in caring for women with post-partum hemorrhages, including within the six months preceding trial and numerous cases of uterine atony. She is also actively involved in teaching medical students in the area of obstetrics.

Trial Court Opinion, 8/27/13, at 28. The trial court's determination is supported in the record.

> Dr. Roberts testified that as an inpatient consultant,
>
> I take care of an unusually large amount of women with antepartum hemorrhage; and the reason is that four days a week, I do ultrasounds. And women are referred to high risk specialists such as I am for ultrasounds because they're having vaginal bleeding and they're looking to figure out why it happened. And if I make a diagnosis, let's say a placenta abnormality, they're looking to find out how to follow the patient, what tests need to be done, when to deliver the patient, and how to deliver them.

N.T., 5/15/13, at 658. Dr. Roberts explained that she had cared for many patients with uterine atony, and is considered an expert in that condition.

*Id.* at 660. Dr. Roberts testified that she is the chairperson responsible for the care of the patients in the Lehigh Valley healthcare system. *Id.* at 661. According to Dr. Roberts,

> I am primarily a clinician. I mean I see patients four days a week. I still have my name on … one or two publications a year…. [T]he majority of my time is not, is not doing research. It's taking care of patients myself, and then, of course, I'm teaching.

*Id.* at 665. Dr. Roberts testified that she is involved in lecturing medical students in obstetrics and gynecology, and sees patients with the residents at the high risk clinic. *Id.* at 666. Upon review, we discern no abuse of discretion by the trial court in deeming Dr. Roberts qualified as an expert under MCARE.

Order affirmed in part and reversed in part; case remanded for a new trial consistent with this Memorandum; Superior Court jurisdiction is relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/16/2014