655 A.2d 1015

**Allan K. SMITH and Donna J. Smith, Appellees,**

**v.**

**PENBRIDGE ASSOCIATES, INC., D/B/A
Penbridge Farms, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 25, 1995.

Filed March 14, 1995.

412

F. Walter Bloom, III, Oil City, for appellees.

Keith Michael Pemrick, Brian M. Paid, Franklin, for appellant.

Before ROWLEY, P.J., McEWEN and POPOVICH, JJ.

POPOVICH, Judge.

An emu is not uncommon in Australia or as a clue in an American crossword puzzle. But, unless our research was not extensive enough, we can state that emus have never before in Pennsylvania been the subject of litigation, litigation that has herein produced a small trove of contract law principles.

This is an appeal from the order of May 31, 1994, entered in the Court of Common Pleas of Clarion County denying appellant's motion for judgment notwithstanding the verdict or, in the alternative, for new trial.[1] Herein, we are asked to determine whether appellant should be held liable for the sale of two male emus to appellees when appellant expressly warranted to appellees that the emus were a "proven breeder pair" i.e., a male and a female. Further, we are presented with issues pertaining to the award of damages to appellees and whether certain witnesses were qualified to testify as experts. Upon examination, we affirm.

Before delving into our analysis of the novel questions at issue, we shed informative light on this creature from "The Land Down Under". An emu is a flightless bird which

[1]. On June 24, 1994, the order in question was reduced to judgment against appellant in the amount of $105,215.80.

originates from Australia. An mature emu typically stands at 5½ feet and weighs about 125 pounds. Its features resemble those of its bigger relative, the ostrich. For breeding purposes, emus have a better temperament than ostriches. The industry of emu breeding in the United States has grown significantly within the past decade because emus adapt easily to various climates and produce rapidly on far fewer acres of land in relationship to traditional livestock. Moreover, the popularity for emu breeding has grown because an emu efficiently produces the following: red meat which is low in fat and cholesterol but high in protein; oil which is used in medicinal and cosmetic products; leather which is used for boots, briefcases, purses and clothing; feathers which are used for fashion clothing and dusters; and broken eggs which are made into jewelry. A female emu usually begins laying at age 18–30 months and will continue laying for 20–25 years.[2]

From our view of the record, we recount the history of this contract dispute over the sale of emus as follows: In July, 1992, appellee, Donna Smith, telephoned Tomie Clark, the manager of Penbridge Farms ("appellant"), in response to an advertisement appellant had placed in the July issue of *Emu Finder Guide* concerning the sale of proven breeder pairs. Trial N.T. 1/26/94 at 36, 39–41. A proven breeder pair of emus consists of one male and one female, which had previously bonded, successfully bred and produced fertile eggs. Trial N.T. 1/26/94 at 25; Trial N.T. 1/27/94 at 60. Upon additional telephone exchanges, appellant informed appellees that a proven breeder pair was available for purchase. Trial N.T. 1/26/94 at 44. On or about July, 23, 1992, appellees sent appellant a check in the amount of $4,000.00 as a down payment for the purchase of a proven breeder pair of emus. Trial N.T. 1/26/94 at 45. On August 4, 1992, appellees drove from Clarion County to appellant's farm in Michigan to purchase the emus. Ms. Clark and another agent of appellant selected the pair of emus from a pen that held another emu.

**2.** We have gathered this general information about emus from an article published in the Lewisburg, Pennsylvania's *Valley Trader*, February 1, 1995, at 1, 8. This information is not disputed in the instant case.

Donna Smith, concerned that she and her husband were properly getting the proven breeder pair, asked appellant's agents several times whether the selected emus were a male and a female and whether they were a proven breeder pair.

The gender of an emu is not discernable by mere external observation, but appellant's agents assured appellees that the pair selected had successfully produced chicks. Trial N.T. 1/26/94 at 47–49. Appellees agreed to purchase the pair of emus and paid appellant the balance of the total price of $12,500.00. Trial N.T. 1/26/94 at 49–50. Appellees then returned home that evening to their farm in Clarion County with their newly acquired birds which they named, "Andrew" and "Rachel". Trial N.T. 1/26/94 at 52–53.

Upon arrival, appellees placed the two emus alone in the same pen. Trial N.T. 1/26/94 at 52–53. In late October, 1992, during the commencement of breeding season, Donna Smith noticed for the first time that both "Andrew" and "Rachel" were "grunting". Grunting is a male trait. Trial N.T. 1/26/94 at 58. Donna Smith immediately telephoned appellant's agent to inform appellant of the grunting. Trial N.T. 1/26/94 at 59. The agent advised Donna Smith that she should "vent sex" the emus to determine their gender. Trial N.T. 1/26/94 at 59–60. Vent sexing is a procedure whereby the inside of the emu is felt manually to determine the presence of a male organ. Trial N.T. 1/26/94 at 55. The next day, appellees performed the vent sexing on the two emus. The vent sexing revealed that "Andrew" was a male. But, much to their chagrin, appellees discovered that "Rachel" was also a male. Trial N.T. 1/26/94 at 60. Appellees then immediately mailed a video-tape of the vent sexing of "Andrew" and "Rachel" to appellant. Additionally, appellees telephoned appellant's agents to notify appellant that both emus were males and to request that appellant rectify their predicament. Trial N.T. 1/26/94 at 60–61.

However, communications failed, and on December 2, 1992, appellees brought suit against appellant seeking damages on grounds that the two male emus were worth substantially less than a proven breeder pair, and appellees suffered consequen-

tial damages for not selling chicks that would have hatched from the 1992–93 breeding season. On January 26–27, 1994, the lower court held a bench trial, and on February 8, 1994, the court below entered a verdict in favor of appellees. On February 18, 1994, appellant filed a post-trial motion requesting the entry of judgment N.O.V. or, in the alternative, a new trial. By order dated May 31, 1994, the lower court denied that post-trial motion, and on June 24, 1994, judgment was entered on the verdict in the amount of $105,215.80. This timely appeal ensued.

Appellant poses five questions for our evaluation:

1. DID THE TRIAL JUDGE ERR IN AWARDING DAMAGES TO THE [APPELLEES] WHERE THEY FAILED TO INSPECT THE GOODS (EMUS) EITHER AT THE TIME OF DELIVERY, OR WITHIN A REASONABLE PERIOD OF TIME THEREAFTER, AS REQUIRED BY INDUSTRY CUSTOM AND THE UNIFORM COMMERCIAL CODE?

2. DID THE TRIAL JUDGE ERR IN AWARDING DAMAGES TO [APPELLEES] WHERE THEY FAILED TO GIVE NOTICE OF THE ALLEGED BREACH TO PENBRIDGE WITHIN A REASONABLE PERIOD OF TIME AS REQUIRED BY THE UNIFORM COMMERCIAL CODE?

3. DID THE TRIAL JUDGE ERR IN AWARDING DAMAGES FOR LOST FUTURE PROFITS OR PRODUCTION WHERE [APPELLEE'S] EVIDENCE WAS SPECULATIVE AND WAS INSUFFICIENT, AS A MATTER OF LAW, TO ESTABLISH THOSE DAMAGES?

4. DID THE TRIAL JUDGE ERR IN ALLOWING [APPELLEES] TO PRESENT EVIDENCE ON DAMAGES AT A TIME AND PLACE OTHER THAN THE TIME AND PLACE WHERE THE SALE OCCURRED?

5. DID THE TRIAL JUDGE ERR IN PERMITTING DONNA SMITH AND WILLIAM CISSEL TO EXPRESS OPINIONS ABOUT THE EXPECTED FUTURE PRO-

DUCTION OF A BREEDER PAIR OF EMUS WHEN THEY WERE NOT QUALIFIED TO DO SO, AND WHERE [APPELLEES] FAILED TO LAY AN ADEQUATE FOUNDATION FOR THE OPINION TESTIMONY?

Appellant's Brief at 5.

"The standard of review of an order denying judgment notwithstanding the verdict is whether there was sufficient competent evidence to sustain the verdict." *Pirozzi v. Penske Olds–Cadillac–GMC,* 413 Pa.Super. 308, 312, 605 A.2d 373, 375 (1992), *alloc. denied,* 532 Pa. 665, 616 A.2d 985 (1992), *quoting, Wenrick v. Schloemann–Siemag Aktiengesellschaft, et al.,* 523 Pa. 1, 4, 564 A.2d 1244, 1246 (1989). "We must ... afford the verdict winner the benefit of every inference which may reasonably be drawn from the evidence, while rejecting all unfavorable testimony and inferences." *Pirozzi,* 413 Pa.Super. at 312, 605 A.2d at 375, *quoting, Ingrassia Construction Company, Inc. v. Walsh,* 337 Pa.Super. 58, 61, 486 A.2d 478, 480 (1984).

"The standard of review for an order denying a motion for a new trial is whether the trial court clearly and palpably abused its discretion or committed an error of law which controlled the outcome of the case." *Pirozzi,* 413 Pa.Super. at 312, 605 A.2d at 375, *quoting, Stevenson v. General Motors Corp.,* 513 Pa. 411, 425, 521 A.2d 413, 420–421 (1987). "If support for the trial court's decision is found in the record, the order must be affirmed." *Pirozzi,* 413 Pa.Super. at 312–13, 605 A.2d at 375, *quoting, Commonwealth ex rel. Meyers v. Stern,* 509 Pa. 260, 264, 501 A.2d 1380, 1382 (1985).

■ We begin our discussion by addressing appellant's contention that appellees failed to inspect the emus at the time of delivery or within a reasonable period of time thereafter. Appellant maintains that an industry custom existed at the time the emus were purchased by appellees that required appellees to vent sex the emus at that moment. The crux of appellant's argument is that the lower court erred in weighing

expert testimony of industry custom presented by both parties in favor of appellees.

The lower court rejected appellant's expert testimony of industry custom on the basis that it was irrelevant and immaterial to this matter which involved an express warranty to furnish "a proven breeder pair" of emus. Trial Opinion 5/31/94 at 7–9. We find that the lower court properly assessed appellant's claim in light of 13 Pa.C.S.A. § 1205(d) of the Uniform Commercial Code. That section provides in pertinent part as follows:

> **(d) Construction.—**The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade. . . .

13 Pa.C.S.A. § 1205(d). The weakness of appellant's argument is that it presupposes that appellant did not expressly agree to furnish appellees with a "proven breeder pair" of emus.[3] "Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." 13 Pa.C.S.A. § 2313(a)(2), UCC. "[C]ustom cannot prevail where the terms of a contract are clear and unambiguous." *Commonwealth of Pennsylvania, State Highway and Bridge Authority v. E.J. Albrecht Co.*, 59 Pa.Commw. 246, 253, 430 A.2d 328, 331 (1981), *citing, Gallizzi v. Scavo*, 406 Pa. 629, 179 A.2d 638 (1962). Here, the record indisputably establishes that appellant expressly and unambiguously contracted to sell appellees a "proven breeder pair" of emus. Consequently, we hold that

---

**3.** Appellant cites *Electric Reduction Co. v. Colonial Steel Co.*, 276 Pa. 181, 120 A. 116 (1923), to buttress its contention that the lower court erred in not finding that industry custom required gender inspection at the time of the delivery. We are of the opinion that our Supreme Court decision in that case is not dispositive of the instant facts. There, our Supreme Court determined that evidence of industry custom and usage of trade was properly admitted to effectuate the meaning of the contract because its terms were unclear. *Id.* Here, on the other hand, the agreement expressly and unequivocally provided for the sale of a "proven breeder pair" of emus. Appellant does not contest the existence nor the viability of those terms.

the lower court properly determined that the express terms of the agreement were not trumped by any evidence of industry custom or usage of trade.

■ Even assuming *arguendo* that the terms of the agreement at issue were not expressly stated, we would find appellant's challenge to the lower court's evaluation of the the expert witnesses' credibility on industry custom to be meritless. A determination as to the credibility of witnesses is within the exclusive province of the trier of fact who is free to believe all, part, or none of a witness' testimony. *Stahli v. Wittman*, 412 Pa.Super. 281, 603 A.2d 583 (1992), *appeal denied*, 533 Pa. 601, 617 A.2d 1275 (1992). "[C]redibility of witness is not for [an appellate court] to pass upon; we will not substitute our judgment for that of the fact finder when there is sufficient evidence to support his conclusions." *Commonwealth Ex Rel. Alexander v. Alexander*, 445 Pa. 406, 411, 289 A.2d 83, 86 (1971); *See Burston v. Dodson*, 257 Pa.Super. 1, 13–15, 390 A.2d 216, 222 (1978) (Superior Court must defer to a lower court's appraisal of witness' credibility). "The fact finder treats an expert like any other witness and applies to him the same standards of credibility as to any other witness." *Kot v. Commonwealth of Pennsylvania, Department of Transportation*, 128 Pa.Commw. 138, 142, 562 A.2d 1019, 1021 (1989), *appeal denied*, 525 Pa. 587, 575 A.2d 117 (1990).

■ Appellant also maintains that appellees failed to effectuate a revocation of an acceptance of the two emus within a reasonable time. In addressing this contention, we will scrutinize appellant's second issue raised herein concurrently to determine whether notice of the breach was proper. Appellant directs our Court's attention to 13 Pa.C.S.A. §§ 2608(b), 2607(c)(1), of the Uniform Commercial Code. Those sections read as follows:

§ 2608. **Revocation of acceptance in whole or part**

(b) **Time and notice of revocation.**—Revocation of *acceptance* must occur within a *reasonable time* after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods

which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.[4]

§ 2607. **Effect of acceptance; notice of breach; burden of establishing breach after acceptance; notice of claim or litigation to person answerable over**

(c) **Notice of breach.**—Where a tender has been accepted:

(1) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; . . .

13 Pa.C.S.A. §§ 2608(b), 2607(c)(1) (emphasis added).[5]

"Under Pennsylvania law, what is a reasonable time after tender or delivery for rejection or revocation of defective goods is generally deemed a question of fact to be resolved by the fact finder, and no express outside time limit is set." *Ford Motor Credit Co. v. Caiazzo*, 387 Pa.Super. 561, 564 A.2d 931 (1989) (citations omitted).

Upon review, we conclude that the lower court's finding that appellees revoked their acceptance of the two male emus within a reasonable time is adequately supported by compe-

4. The Uniform Commercial Code provides the following definition for "reasonable time": "What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action." 13 Pa.C.S.A. § 1204(b).

5. The Uniform Commercial Code defines "acceptance" as follows:
 § 2606. **What constitutes acceptance of goods**
 (a) **General rule.**—Acceptance of goods occurs when the buyer:
 (1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity;
 (2) fails to make an effective rejection (section 2602(a)), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
 (3) does any act inconsistent with the ownership of the seller; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.
 13 Pa.C.S.A. § 2606(a). The lower court ruled that appellees acted within a reasonable time after delivery of the emus to protect their interests regardless of whether their duty of notice was framed in terms of a rejection, *see* 13 Pa.C.S.A. § 2602, U.C.C., or a revocation of acceptance. Trial Opinion 5/31/94 at 11–12. Although we find an acceptance on the part of appellees, we deem it timely revoked under the facts of this case.

tent evidence. The record reveals that appellees ascertained that "Rachel" and "Andrew" were not a "pure breeding pair" of emus when they examined the birds internally in late October, 1992. Within two days after the sex venting, appellants were fully apprised by appellees of the breach. Trial N.T. 1/26/94 at 60–61. Appellants argue that appellees *should have* discovered the breach earlier. We disagree. Appellant rebukes appellees for not sex venting the emus on appellant's farm at the time of purchase or immediately upon their return to Pennsylvania. Appellant maintains that this procedure was easily accessible to appellees and that appellees had a responsibility of exercising it themselves. We note that appellant blindly excuses itself from undertaking that same task before selling the emus to appellees. Further, the lower court, sitting as the fact finder in this case, determined that sex venting was dangerous both to the breeding emu and the person administering it. Trial Opinion 5/31/94 at 12.[6]

Appellant expressly warranted the emus to be a "pure breeder pair" and reassured appellees that the emus were as represented. Indeed, we find that the nature of the agreement and goods at issue coupled with assurances had the effect of inducing appellees to delay an internal inspection of the emus. *See* 13 Pa.C.S.A. Comment 3 of § 2608, U.C.C. (effect of assurances is that they induce the buyer to delay discovery). Upon returning to their Clarion County farm, appellees were not presented with any facts or circumstances that would reasonably lead them to question the breeding ability of the emus until Donna heard both grunting in late October, 1992. Although "Rachel" *may have looked like a female emu and walked like a female emu, it certainly did not sound like a female emu.* Thereafter, appellees promptly notified appellant of the breach. *Compare Rad Services, Inc. v. American Refining Group, Inc.*, 330 Pa.Super. 308, 479 A.2d 565 (1984) (retailer's notice of breach to distributor was

---

6. Appellees presented testimony revealing that sex venting may cause an infection of the sex organs and may even cause an emu to go into shock. Trial N.T. 1/26/94 at 123–124. Further, the person administering the sex venting may become kicked or clawed by the emu. Trial N.T. 1/26/94 at 123.

timely when several months had elapsed before retailer discovered gas shortage which was attributed to distributor's faulty terminal meter). Accordingly, we find no error of law in the lower court's disposition of appellant's first and second issues raised herein.

■ We now turn to the merits of appellant's claims challenging the lower court's award of damages to appellees. Appellant's third contention poses the question of whether evidence was speculative and insufficient to support an award of consequential damages, including damages for lost profits. Appellant structures its argument as follows:

> Given the fact that the breeding of the emus is a relatively new business, and the fact that there is no reliable data to project the ultimate success in breeding emus, the [appellees'] claims for loss of chick production are entirely speculative and do not meet the "reasonable certainty" requirement of the law of damages.

Appellant's Brief at 22.

The Uniform Commercial Code provides the following circumstances for the recovery of consequential damages resulting from the breach of the seller: (1) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by "cover" or otherwise;[7] and (2) injury to person or property proximately resulting from any breach of warranty. 13 Pa.C.S.A. § 2715(b). *See* Comment 4 to § 2715 (burden on buyer to prove consequential damages in manner which is reasonable under the circumstances rather than showing of certainty which requires almost mathematical precision).[8]

---

**7.** "[T]he buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." 13 Pa.C.S.A. § 2712(a).

**8.** Appellant does not dispute whether it had reason to know that a breach would result in losses to appellees nor does it contest appellees' conduct in preventing their losses by cover.

"Pennsylvania allows consequential damages in the form of lost profits to be recovered." *AM/PM Franchise v. Atlantic Richfield*, 526 Pa. 110, 119, 584 A.2d 915, 920 (1990) (citations omitted). "Lost profits are, in fact, the difference between what the plaintiff actually earned and what they would have earned had the defendant not committed the breach." *Id.* at 123, 584 A.2d at 922. "The ... mere uncertainty as to the amount of damages will not bar a recovery where it is clear that damages were the certain result of the defendant's conduct." *Standard Pipeline Coating v. Solomon & Teslovich*, 344 Pa.Super. 367, 379, 496 A.2d 840, 846 (1985), *citing, Pugh v. Holmes*, 486 Pa. 272, 405 A.2d 897 (1979).

In the case at bar, appellees alleged that the "proven breeder pair" bargained for would have produced about thirty (30) chicks in the 1992/1993 breeding season. The "proven breeder pair" had produced sixteen (16) chicks in the previous breeding season. Appellees presented testimony revealing that it was reasonable to expect a doubling of chick production from a proven breeder pair in the following year. Trial N.T. 1/26/94 at 32, 130–133.[9]

 The determination of damages lies with the fact finder, who weighs the evidence and assesses the credibility of the witnesses. *Young v. Dart*, 428 Pa.Super. 43, 53 n. 2, 630 A.2d 22, 27 n. 2 (1993). Although the court recognized that emu breeding was a relatively new commercial business, it determined that the award of consequential damages could be calculated with a reasonable degree of certainty from the evidence adduced at trial. The court below initially found that the value of a three-month old chick produced from the 1992/1993 season was $5,000.00. Trial Opinion 5/31/94 at 17. The lower court then concluded that appellees suffered incidental and consequential damages in the amount of $90,-000.00.[10] In arriving at that figure, the court below was

---

**9.** Obviously, "Andrew" and "Rachel" could not breed with each other. Appellees tried unsuccessfully to breed the two male emus with female emus.

**10.** From $90,000.00, the lower court subtracted $200.00 which represented the maintenance cost for raising the chicks to age three months.

conservative in its finding of the expected chick production from the 1992/1993 breeding season absent appellant's breach. Trial Opinion 5/31/94 at 18–19. From our thorough evaluation of the record, we conclude that the evidence was sufficient for the lower court to measure appellee's lost profits with a reasonable degree of certainty. "[D]amages do not have to be determined with mathematical precision, but only a reasonable degree of certainty." *Solomon & Teslovich,* 344 Pa.Super. at 379, 496 A.2d at 846. "The basis for this rule is that the breaching party should not be allowed to shift the loss to the injured party when damages, even if uncertain in amount, were certainly the responsibility of the party in breach." *Pugh,* 486 Pa. at 297, 405 A.2d at 910, *citing, Story Parchment Co. v. Paterson Paper Co.,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

■ We also find that the lower court did not err in its disposition of appellant's fourth argument. Appellant contends that the court below erred in assessing damages at the time and place the breach was discovered rather than at the time and place the emus were accepted by appellees. The Uniform Commercial Code provides the following guidance on evaluation of damages for breach of warranty:

The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been warranted, *unless special circumstances show proximate damages of a different amount.*

§ 2714(b), U.S.C. *See* Comment 3 to § 2714 (measure of damages for breach of warranty at time and place of acceptance is not intended as an exclusive measure). "The Code permits an award of proximate damages of a different amount if special circumstances exist and further allows in certain cases for recovery of losses resulting from the particular need of the buyer." *Cober v. Corle,* 416 Pa.Super. 191, 610 A.2d 1036 (1992).

In early August, 1992, appellees purchased the emus from appellant for a total price of $12,500.00. At trial, appellees

presented evidence revealing that the value of a "proven breeder pair" of emus had substantially increased from August, 1992 to October, 1992. Trial N.T. 1/26/94 at 66–67. In late October, 1992, at the time appellees discovered the breach of warranty, the two male emus together were worth $15,-000.00. The value of a "proven breeder pair" was $28,000.00. Trial N.T. 1/26/94 at 66. The court below found that under the special circumstances of this case, appellees were entitled to $13,000.00, the difference between the aforementioned amounts.[11] The determination of damages lies within the discretion of the fact finder, who weighs the evidence and assesses the credibility of the witnesses. *Young*, 428 Pa.Super. at 52–54, 630 A.2d at 27. Upon review, we find no abuse of discretion nor error of law in the lower court's measure of damages at the time that the breach was discovered by appellees.

■ Appellant's fifth and final assignment of error challenges the lower court's evidentiary ruling that certain witnesses were qualified to give expert opinions. In evaluating this issue, we embrace the following principles as enunciated by our Supreme Court in *Ruzzi v. Butler Petroleum Co.*, 527 Pa. 1, 588 A.2d 1 (1991):

In general, it is for the trial judge to determine whether a particular witness qualifies as an expert, *Griffith v. Clearfield Truck Rentals, Inc.*, 427 Pa. 30, 233 A.2d 896 (1967), and his decision on this matter will be reversed only for a clear abuse of discretion. *Houston v. Canon Bowl, Inc.*, 443 Pa. 383, 278 A.2d 908 (1971). An expert witness has been defined as a person who possesses knowledge not within the ordinary reach and who, because of this knowledge is specially qualified to speak upon a particular subject. *Steele v. Shepperd*, 411 Pa. 481, 192 A.2d 397 (1963). It is not necessary that the witness possess all the knowledge in his special field of activity. However, the witness must have a

---

**11.** Appellant's own expert witness also testified that the value of the two male emus was $15,000.00 in late 1992, and that the value of a proven breeder pair had climbed from $20,000.00 in August, 1992, to $30,-000.00 by 1993. Trial N.T. 1/27/94 at 64, 65.

reasonable pretension to specialized knowledge on the subject under investigation. *Kuisis v. Baldwin–Lima–Hamilton Corp.,* 457 Pa. 321, 319 A.2d 914 (1974). 527 Pa. at 10, 588 A.2d at 5. "The standard does not mandate, however, that the witness need possess all the knowledge in his or her special field of activity in order to qualify." *Yoho v. Stack,* 373 Pa.Super. 77, 83, 540 A.2d 307, 310 (1988). "[T]here is no requirement that a witness acquire expertise as a result of formal schooling; expertise acquired by experience is expertise nonetheless." *Gottfried v. American Can Co.,* 339 Pa.Super. 403, 411, 489 A.2d 222, 226 (1985).

Appellant contests the trial court's determination that appellee, Donna Smith and William Cissel were qualified to testify as experts on the expected future production of the "proven breeder pair" of emus bargained for by appellees. Specifically, appellant argues that Ms. Smith and Mr. Cissel lacked experience to have "specialized knowledge".

Ms. Smith's qualifications as an expert in this matter included the following: that she along with other investors had purchased approximately 100 emus; that she had made her first purchase of an emu in October, 1991; that she operated an emu farm consisting of 70 emus; that her emus had successfully produced 45 hatched eggs; that she belonged to the American Emu Association and Regional Emu Chapter; that she subscribed to several publications on emu farming; and that she had attended several seminars on emu farming. Trial N.T. 1/26/94 at 15–23.

Mr. Cissel's qualifications as an expert in this matter included the following: that he had purchased and sold emus since 1990; that in 1993, he had grossed $199,000.00 in the sale of emus, that he had 6 breeder pairs in the 1992/1993 season; that he had 10 breeder pairs in the 1993/1994 season; that his breeder pairs had laid over 200 eggs; and that he organized seminars on emu breeding. Trial N.T. 1/26/94 at 105–111.

■ At the time of trial in January, 1994, emu breeding was a relatively new commercial business. Appellant's own expert witness, Patrick Hoctor, testified on direct examination that

the industry lacked commercial significance in the United States until 1988. Trial N.T. 1/27/94 at 44. Mr. Cissel and Ms. Smith had been engaged actively in the emu industry since 1990 and 1991, respectively. At first glimpse, their years of experience do not appear to be of great significance. *Compare Yoho*, 373 Pa.Super. at 82–84, 540 A.2d at 310 (expert had 10–15 years of experience); *Gottfried*, 339 Pa.Super. at 411–13, 489 A.2d at 227 (expert had 11 years of experience). However, in light of the evidence that emu breeding was a fairly young industry coupled with the dynamic involvement of Ms. Smith and Mr. Cissel within this short period of time, we are not inclined to disturb the lower court's determination that both witnesses were qualified to deliver expert opinions on the breeding ability of emus. Thus, we find no abuse of discretion in the trial court's ruling of appellant's fifth and final issue raised herein.[12]

We hold that there was sufficient competent evidence to sustain the verdict. Having scrutinized appellant's points of error and finding that they do not avail relief to appellant, we, accordingly, affirm the order entered by the lower court.

Order affirmed.

---

**12.** Appellant also asserts that the lower court committed an error of law in allowing Donna Smith to deliver her expert opinions because they were based upon hearsay from seminar materials and conversations she had with others in the industry. "The argument shall be .. followed by such discussion and citation of authorities as are deemed pertinent." Pa.R.A.P. 2119(a), 42 Pa.C.S.A. *See Nimick v. Shuty*, 440 Pa.Super. 87, 100, 655 A.2d 132, 138 (1995) (appellate brief must include pertinent discussion along with citation to pertinent authorities). Arguments that are not appropriately developed are waived. *Id. See In re Estate of Smith*, 492 Pa. 178, 180–82, 423 A.2d 331, 332 (1980) (appellant's brief was inadequate to present issues for review where brief failed to refer specifically to record). Appellant has failed to cite any authority and has also neglected to cite to the record in support of its contention that Donna Smith's opinions were improperly admitted on the ground of hearsay. Therefore, we deem that claim waived.