J. A25038/15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| LOMBARD METALS CORPORATION | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| v. | : | |
| | : | |
| AMG RESOURCES CORPORATION, | : | |
| | : | |
| Appellant | : | No. 822 EDA 2015 |

Appeal from the Judgment Entered March 9, 2015
In the Court of Common Pleas of Philadelphia County
Civil Division No(s).: January Term, 2013 No. 000994

BEFORE: DONOHUE, MUNDY, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                **FILED OCTOBER 21, 2015**

Appellant, AMG Resources Corporation, appeals from the judgment entered in the Philadelphia County Court of Common Pleas in favor of Appellee, Lombard Metals Corporation, in the sum of $95,165.01 plus 6% interest from July 31, 2012, to the date of judgment ($14,219.36), for a total of $109,384.37. We affirm.

The trial court stated the factual and procedural history of this case as follows:

> [Appellee] commenced the current action against [Appellant] on January 11, 2013, seeking damages resulting from an alleged breach of contract. [Appellant] had purchased steel from a metal strapping company, RG Steel, LLC (or RG Steel Sparrow Point, LLC), and then resold the material to [Appellee]. After [Appellee]

---

[*] Former Justice specially assigned to the Superior Court.

purchased the metal, it was transported to a public warehouse during the period April 18, 2012 through approximately May 3, 2012. On June 22, 2012, [Appellee] was informed from a potential buyer that there were tags on the outside of the steel stating that "this material has holes." That same day, [Appellee] emailed [Appellant's] representative, Bob Reineke, about the tags and the possibility of non-conformity. The material was then unwound and inspected on July 6, 2012, whereupon it was discovered that it contained defects. Upon learning of the defects, [Appellee] immediately notified [Appellant.]

It is undisputed that [Appellant] unknowingly sold [Appellee] material that was non-conforming.

Trial Ct. Op., 1/26/15, at 1-2 (footnotes omitted).

Appellant and Appellee stipulated, *inter alia*, to the following facts:[1]

11. [Appellee] paid [Appellant] the total sum of $166,566.40 for the Material, in full.

* * *

19. On July 26, 2012, Bob Reineke of [Appellant] contacted RG Steel's representative, Chuck McDaniel, by email to advise Mr. McDaniel of the problem with the Material.

20. In his email of July 26, 2012, Mr. Reineke, stated that "the material was tagged by Samuels Strapping as having holes. I bought (and sold) this material based on the fact that it had surface scratches, similar to the ones on a picture you sent me. . . . As these coils have already been slit to narrow widths, this defect renders this material to only be usable as scrap."

21. Also in the email of July 26, 2012, Mr. Reineke, on behalf of [Appellant], proposed that [Appellant] would "buy all the material for scrap at .08lb where it lays in Toledo,"

---

[1] We note that the trial court incorporated the joint stipulation of facts in its opinion. Trial Ct. Op. at 2 n.2.

and absorb freight and processing charges in settlement of the matter with RG Steel.

22. In an email to Bob Reinke dated July 31, 2012, Mr. McDaniel [ ] stated "After review, it is agreed that the 1035 claim material purchased by [Appellant] was misrepresented by RG Steel. The material received contained numerous holes and was not usable, or able to be processed in any reasonable manner."

23. In that same email of July 31, 2012, Mr. McDaniel stated RG Steel's agreement to accept [Appellant's] proposal to reduce the price of the Materials to reflect their scrap value.

**Considering other costs that have been incurred in transporting material RG will accept the scrap retention price of $8.00CWT. Please reduce [sic] adjust open invoices to account for the difference in price.**

24. RG misrepresented the condition of the Material to [Appellant].

25. RG Steel filed for bankruptcy protection on May 30, 2012 in the United States Bankruptcy Court for the District of Delaware.

26. On or about September 24, 2012, [Appellant] filed a proof of claim in RG Steel's bankruptcy case for the difference in value between the Material as represented and as sold. [Appellant's] proof of claim states, in part, as follows:

> **On or about March 14, 2012, [Appellant] contracted with the Debtor to purchase 400 net tons of steel. . . . Pursuant to the contract, the material was required to be usable steel with some surface scratches (as opposed to scrap metal). The Debtor represented and warranted to [Appellant] that the steel was usable, and, relying upon such representation and warranty, [Appellant] re-sold such material to a third party. . . . Following receipt of the steel by**

> **[Appellant's] third-party customer, [Appellant] was notified that the steel was nonconforming and not usable as represented and warranted by the Debtor. Specifically, the steel was scrap rather than usable steel. The difference between the purchase price for the material abased on the representation that it was usable steel and the market value of the steel as scrap was $96,640 (as acknowledged and agreed by the Debtor), and [Appellant's] third party customer has asserted damages against [Appellant] based on such difference. Acknowledging that it had misrepresented the material, the Debtor agreed to credit [Appellant] the amount of $96,640 against other open invoices as a result of the nonconforming goods. . . .**

Joint Stipulation of Facts, 12/1/14, at ¶¶ 11, 19-26 (emphases in original).

At the bench trial, John Ruttenberg, Appellee's president testified that the steel is "packaged in steel coils. It looks like toilet paper with steel bands around it, which is steel strapping to hold it together for slipping. [sic]" N.T., 12/2/14, at 17. He did not inspect the steel "[b]ecause Bob Reineke is a reputable supplier and we had good business relations together and I trusted his description of the steel and accepted it." *Id.* He testified that if the seller is not as reputable as Bob Reineke, he would "send somebody out to inspect the steel before we take possession." *Id.* In order to inspect a steel coil, "it would have to be put up on a machine, an uncoiler, to unwrap the steel so the surfaces or whatever can be inspected as it rolls off." *Id.* at 18. Mr. Reineke agreed to compensate Appellee for the difference between the price paid and the market price for steel sold at scrap

value. *Id.* at 25. Mr. Ruttenberg estimated Appellee's total damages to be approximately $90,000. *Id.* at 28.

Mr. Reineke testified that he buys and sells steel within the course and scope of his employment with Appellant. *Id.* at 52. He has been in the industry since 1976. *Id.* He sold the steel to Appellee as 1035 cold rolled steel with surface scratches. *Id.* at 54. Mr. Reineke testified, *inter alia*, as follows:

> Appellee's Counsel: And you understood that [Appellee] relied on your description in deciding to purchase the steel, right?
>
> A: Yes.
>
> Q: That's a reasonable way to do business, isn't it?
>
> A: Yes.
>
> Q: And you knew that [Appellee] bought it on the strength of your reputation as an honorable person in the industry, right?
>
> A: Yes. I believe so.
>
> Q: And [Appellee] didn't inspect the steel, did it—
>
> A: No.
>
> Q: —before committing to buy it from you?
>
> A: Oh, I don't think they could have.
>
> Q: Why not?
>
> A: Well, generally, many times, when you buy steel that's in an independent location like this was, the owner or the original customer gets a little squirrelly [sic] about having

someone come into their plant to inspect the steel. So generally that's a difficult thing to accommodate.

* * *

The Court: Is it fair to say in your industry everybody pretty much knows everybody in this area, for example.

The Witness: Yeah. When you've been around as long as John and myself, you pretty much know most of the players but not all, Your Honor.

* * *

Appellee's Counsel: During your many years in this business— as a result of your many years in this business, did you tell John Ruttenberg on June 22nd or on July 6th or on any date you're being unreasonable?

A: No.

* * *

Q: You never told [Appellee] at any point prior to this litigation, which wasn't filed until January of 2013, that they waited too long, did you?

A: No. I don't believe I told them that. I told them that I would try to accommodate them.

* * *

Q: That wasn't my question. [Appellee] made claim to you and you made immediate claim to RG, right?

A: That's correct. Yes.

Q: And RG never told you that you were late, did they?

A: No.

Q: They never told [sic] that you waited an unreasonable period of time to make claim, did they?

A: No.

***Id.*** at 54-56, 60, 72-73.

The trial court found in favor of Appellee for breach of contract and awarded damages. Appellant filed a motion for post trial relief, which the court denied on February 18, 2015. Judgment was entered on March 9, 2015. This timely appeal followed. Appellant was not ordered to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. The trial court filed an opinion incorporating its January 26, 2015 order and opinion.

Appellant raises the following issues for our review:

> 1. Whether the trial court erred as a matter of law by failing to cite and apply commercial standards to [Appellee], a merchant buyer, for the time to revoke, as the Uniform Commercial Code ("U.C.C.") requires?
>
> 2. Whether the trial court erred as a matter of law by failing to apply commercial standards to [Appellee], a merchant buyer, for the time to revoke where there is undisputed evidence that [Appellee] (1) failed to inspect the material in a timely manner; and (2) failed to revoke acceptance of the material within the time it should have discovered the nonconformity?

Appellant's Brief at 2.

Appellant argues the trial court erred in failing to "cite and apply commercial standards to [Appellee's] behavior . . . ." ***Id.*** at 17. Appellant avers that the trial court's failure to apply commercial standards "comes in three parts." ***Id.*** "First, the trial court never stated that it must evaluate [Appellee's] behavior according to commercial standards of merchant buyers, as the U.C.C. requires." ***Id.*** "Second, the trial court demonstrated

in its conclusion of law that it did **not** apply commercial standards to [Appellee], a merchant buyer." **Id.** "Third . . . the trial court ignored undisputed evidence that [Appellee] did nothing for months according to commercial standards of merchant buyers." **Id.** at 19. Appellant contends "the trial court erred as a matter of law by not citing and applying commercial standards to the time a merchant buyer has to revoke, as required by 13 Pa.C.S.A. §§ 2608(b), 2607(c)(1), 2607, official cmt. no. 4." **Id.**

We address Appellant's issues together because they are interrelated. Our review is governed by the following principles: "Instantly, the trial was before a judge without a jury and, accordingly, our scope of review is limited to a determination whether the court's finding that appellee rejected [the goods after delivery] within a reasonable time is supported by competent evidence." **Yates v. Clifford Motors, Inc.**, 423 A.2d 1262, 1268 (Pa. Super. 1980). "Under Pennsylvania law, what is a **reasonable time** after tender or delivery for rejection or revocation of defective goods is generally deemed a question of fact to be resolved by the fact finder, and **no express outside time limit is set**." **Smith v. Penbridge Assocs., Inc.**, 655 A.2d 1015, 1020 (Pa. Super. 1995) (emphases added) (citing **Ford Motor Credit Co. v. Caiazzo**, 564 A.2d 931 (Pa. Super. 1989) (citations omitted)).

The Uniform Commercial Code, in pertinent part, provides as follows:

> **(c) Notice of breach.**—Where a tender has been accepted:

- 8 -

> (1) the buyer must within a **reasonable time** after he discovers or should have discovered any breach **notify the seller of breach** or be barred from any remedy[.]

13 Pa.C.S. § 2607(c)(1) (emphases added).

> The time of notification is to be determined by applying commercial standards to a merchant buyer. "**A reasonable time" for notification** from a retail consumer is to be judged by different standards so that in his case it will be extended, for the rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy.

13 Pa.C.S. § 2607, *cmt*. 4. (emphasis added).

> **(b) Time and notice of revocation.**—Revocation of acceptance must occur within a **reasonable time** after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer **notifies** the seller of it.

13 Pa.C.S. § 2608(b) (emphases added).

This Court in **Moscatiello v. Pittsburgh Contractors Equip. Co.**, 595 A.2d 1198 (Pa. Super. 1991) opined:

> [A] buyer must revoke acceptance of goods within a reasonable time after he "discovers or should have discovered the ground for it." 13 Pa.C.S.A. § 2608. Comment 4 to section 2608 is instructive as to what constitutes "reasonable" time.

> Since this remedy [revocation of acceptance] will be generally resorted to only after attempts at adjustment have failed, the reasonable time period should extend in most cases beyond the time in which notification of breach must be given, beyond the time for discovery of nonconformity after acceptance and beyond the time for rejection after tender.

*Id.* at 1204-05.

In the case *sub judice*, the trial court opined:[2]

> The evidence illustrates that the parties had a positive business relationship, and [Appellee] relied on the nature of this relationship when agreeing to purchase the material from [Appellant]. [Appellant] purchased the material from RG Resources, which was described as "1035 cold rolled with surface scratches," and then proceeded to sell the material in "as described condition" to [Appellee]. When [Appellee] purchased the material from [Appellant], the president of [Appellee], John Ruttenberg, testified that Reineke, "is a reputable supplier and we had good business relations together and I trusted his description of the steel and accepted it." Moreover, Reineke was aware that [Appellee] was relying on his description and was acting based upon [Appellant's] honorable reputation. Until [Appellee] was directly alerted to the presence of tags on the material indicating it contained holes, [Appellee] had no reason to suspect that the material was different than what [Appellant] had promised. . . .
>
> The reasonableness of [Appellee's] notice of breach is further supported by [Appellant's] response to the situation. When [Appellant] received notice of the deformity on June 22, 2012, [Appellant] did not question [Appellee's] timing or inform [Appellee] that its conduct was unreasonable. In fact, after learning of the situation, [Appellant] made a similar claim to RG Steel about the misrepresentation of the quality of the steel. Just as [Appellant] did not raise an issue as to the reasonableness of [Appellee's] notice, RG Steel did not challenge [Appellant's] claim as being untimely. . . .
>
> Because a court is to evaluate reasonableness based upon the circumstances at hand, this court grants substantial weight to the parties' relationship, [Appellee's]

---

[2] We note that Appellant's claims that the trial court failed to cite and apply the Uniform Commercial Code is belied by the record. ***See*** Trial Ct. Op. at 2-3.

reliance on [Appellant's] description, and the parties having not even broached the topic of the reasonableness of the notice until the commencement of litigation. . . . [Appellee] acted reasonably in notifying [Appellant] of the breach and is entitled to damages.

Trial Ct. Op. at 3-4 (citations omitted). We agree no relief is due.

Instantly, the trial court found that Appellee notified Appellant of the breach within a reasonable time. *See* 13 Pa.C.S. § 2607(c)(1). There is no express time limit for buyer's notification of the breach. *See* 13 Pa.C.S. § 2608(b); *Smith*, 655 A.2d at 1020; *Moscatiello*, 595 A.2d at 1204-05. Instantly, after our thorough review of the record we find the trial court's finding that Appellee acted reasonably in notifying Appellant of the breach and its entitlement to damages is supported by competent evidence. *See Yates*, 423 A.2d at 1268.

Judgment affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/21/2015

- 11 -