J-A06011-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| APPLECROSS CLUB OPERATIONS, LLC | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| PULTE HOMES OF PA, LIMITED PARTNERSHIP, PULTE HOME CORPORATION OF THE DELAWARE VALLEY, PH 50 LLC AND PGP TITLE OF FLORIDA, INC. | |
| Appellants | No. 791 EDA 2016 |

Appeal from the Judgment Entered February 18, 2016
In the Court of Common Pleas of Chester County
Civil Division at No(s): 2012-09804

BEFORE:  PANELLA, J., SHOGAN, J., and RANSOM, J.

MEMORANDUM BY PANELLA, J.                **FILED JUNE 13, 2017**

Appellant, Pulte Homes of PA, Limited Partnership ("Pulte")[1] engages in the business of developing and building residential communities throughout Pennsylvania and the United States. Over the course of several years starting in 2001, Pulte acquired equitable ownership of several tracts

---

[1] The remaining appellants are all business entities associated with Pulte. Applecross's complaint alleged the following relationships, none of which were specifically denied by Pulte in its answer: Until June 20, 2012, Pulte Home Corporation of the Delaware Valley was the general partner of Pulte, and was the signatory to the agreements at dispute in this appeal; after June 20, 2012, PH 50 LLC became the general partner of Pulte; and PGP Title of Florida, Inc., is the sole member of Pulte Home Corporation of the Delaware Valley and PH 50 LLC.

of land in East Brandywine Township and West Brandywine Township, Chester County, pursuant to a desire to build an integrated community. The community would be organized around a country club.

The country club, as proposed, was to include an 18-hole golf course, a 20,000 to 25,000 square foot clubhouse, a sports center, a fitness center, an outdoor pool, two tennis courts and a community center. The clubhouse would house casual, grill, and family dining restaurants, as well as banquet space.

Pulte's plan involved building the community, of up to approximately 1,000 homes, over the course of several years. As it was not in the business of running country clubs and golf courses, Pulte initially agreed to sell these facilities to ClubCorp, Inc., a company with experience managing golf courses throughout the United States.

Starting in 2006, Pulte began construction of the golf course and temporary clubhouse facilities to serve the community while it also built the community. In 2008, ClubCorp exercised an option in its contract with Pulte to terminate the agreement. In response, Pulte sought out Appellee, Applecross Club Operations, LLC ("Applecross"), to take over ClubCorp's obligations to purchase and manage the country club.

On March 3, 2009, Pulte and Applecross entered into a Development and Acquisition Agreement. In broad strokes, the 34-page agreement, drafted after extensive negotiations between the parties, provided for

Applecross to acquire and manage the country club for a purchase price of up to $6,500,000. The agreement required the deed to each home in the community to include an obligation to purchase a membership in the country club.

In June 2010, Pulte was eager to close on the sale of the country club to Applecross. After further negotiations between the parties, an amendment to the original Development and Acquisition Agreement was executed on June 30 to address issues of ongoing concern. The parties closed on the sale that same day.

Throughout 2011 and early 2012, Pulte attempted to negotiate a reduction in contract price for some of the community property located in West Brandywine Township, known as the "Anderson" or "Del Webb" tract. The seller ultimately rejected Pulte's offers, and Pulte breached the purchase contract. Pulte paid the seller an agreed upon amount in damages and notified Applecross that the Del Webb tract portion of the community had been cancelled.

Applecross responded by noting that it believed the loss of the Del Webb tract constituted a material change from the conditions of the amended Development and Acquisition Agreement. Pulte disagreed, and Applecross initiated this litigation shortly thereafter.

After significant motion practice and discovery, the trial court determined that the amended Development and Acquisition Agreement was

ambiguous. As a result, the case went before a jury starting on September 14, 2015. Applecross presented evidence that the inclusion of the Del Webb tract into the community was always considered part of the agreement by the parties. Pulte presented countervailing evidence, and argued that the explicit terms of the amended agreement were contrary to Applecross's claims. The jury entered a verdict in favor of Applecross in the amount of $20,000,000. Pulte filed post-trial motions, which were denied by operation of law after 120 days. This timely appeal followed.

On appeal, Pulte raises four issues. The first two issues differ only in the relief requested by Pulte, but are premised upon the same legal theory: that the trial court erred in determining that the amended Development and Acquisition Agreement was ambiguous. In its first argument, Pulte asserts that it is entitled to judgment notwithstanding the verdict ("JNOV") due to this conclusion, while in its second issue, it argues that it is entitled to a new trial.

Pulte's request for JNOV centers upon an alleged error of law committed by the trial court. Our scope of review of such a challenge is plenary. *See Griffin v. Univ. of Pittsburgh Med. Center-Braddock Hosp.*, 950 A.2d 996, 999 (Pa. Super. 2008). In reviewing the trial court's denial of JNOV, "we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict." *Id*. (citation

omitted). Furthermore, we must view all the evidence and draw all inferences in a manner favorable to the verdict winner. *See id*.

In contrast, "[o]ur standard of review from an order denying a motion for a new trial is whether the trial court committed an error of law, which controlled the outcome of the case, or committed an abuse of discretion." *Mirabel v. Morales*, 57 A.3d 144, 150 (Pa. Super. 2012) (citation omitted). "A trial court commits an abuse of discretion when it rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will." *Id*. (citation omitted).

Unless an error of law controls the outcome of a case, we will not reverse an order denying a new trial. *See Lockley v. CSX Transp. Inc.*, 5 A.3d 383, 388 (Pa. Super. 2010). "[A] litigant is entitled only to a fair trial and not a perfect trial." *Id*. at 392 (citation omitted).

Under either theory of relief, Pulte tasks us with determining whether the trial court properly construed the amended Development and Acquisition agreement. Interpretation of a contract poses a question of law and our review is plenary. *See Charles D. Stein Revocable Trust v. General Felt Industries, Inc.*, 749 A.2d 978, 980 (Pa. Super. 2000). "In construing a contract, the intention of the parties is paramount and the court will adopt an interpretation which under all circumstances ascribes the most

reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished." *Id*. (citation omitted).

To discern the parties' intent, we must start with the language used by the parties in the written contract. *See Szymanski v. Brace*, 987 A.2d 717, 722 (Pa. Super. 2009). Generally, courts will not imply a contract that differs from the one to which the parties explicitly consented. *See Kmart of Pennsylvania, L.P. v. M.D. Mall Associates, LLC*, 959 A.2d 939, 944 (Pa. Super. 2008). We are not to assume that the language of the contract was chosen carelessly or in ignorance of its meaning. *See id*.

Where the language of the contract is clear and unambiguous, a court is required to give effect to that language. *See Prudential Prop. and Cas. Ins. Co. v. Sartno*, 903 A.2d 1170, 1174 (2006). Contractual language is ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal Co.*, 519 A.2d 385, 390 (Pa. 1986) (citation omitted). "This is not a question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999) (citations omitted).

When a contract is found to be ambiguous, "extrinsic or parol evidence may be considered to determine the intent of the parties." *Z & L Lumber*

***Co. of Atlasburg v. Nordquist***, 502 A.2d 697, 700 (Pa. Super. 1985). "While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact." ***Kripp v. Kripp***, 849 A.2d 1159, 1163 (Pa. 2004) (citation omitted).

Pulte argues that the trial court erred in determining that the agreement was ambiguous, thereby allowing the admission of parol evidence, or evidence concerning negotiations and prior promises between the parties. Furthermore, Pulte asserts that the trial court erred in allowing the jury to determine what the rights and obligations of the parties were under the agreement.

Specifically, Pulte asserts that the agreement's integration clause establishes that parol evidence was not admissible. "Where the parties to an agreement adopt a writing as the final and complete expression of their agreement, alleged prior or contemporaneous oral representations or agreements concerning subjects that are specifically covered by the written contract are merged in or superseded by that contract." ***Blumenstock v. Gibson***, 811 A.2d 1029, 1035 (Pa. Super. 2002) (citation omitted). The trial court found that the Development and Acquisition Agreement was ambiguous despite the integration clause because exhibits to the agreement were missing.

To determine whether the trial court's ruling was correct, we turn to the relevant portions of the agreement. In the preamble to the agreement, the first whereas clause sets forth the following purpose:

> Whereas, [Pulte] is the owner and/or contract purchaser of certain land in East and West Brandywine Townships, Chester County, Pennsylvania as described on Exhibit____ (the "Development Property") on which [Pulte] is developing a residential community known as Applecross Country Club (the "Community")[.]

(omission of exhibit number in original). It is undisputed that the exhibit referenced in this clause was not attached to the executed agreement.

Pulte cites several non-controlling precedents to support its proposition that the preamble should not be given precedence in construing a contract. *See* Appellant's Brief, at 47. However, even if we were to agree that the cited authority was controlling, it would not be dispositive of the case before us. For example, Pulte quotes an unpublished memorandum of the Eastern District of Pennsylvania: "Recitals in a contract, such as 'whereas' clauses, are merely explanations of the circumstances surrounding the execution of the contract, and are not binding obligations *unless referred to in the operative provisions of the contract*." ***Mozdzierz v. Accenture, LLP.***, 2010 WL 4273323 (E.D. Pa. 2010) (quoting 17A C.J.S. Contracts § 317 (2010) (emphasis supplied).

In the present case, under Article I, "Definitions," the agreement provides that "Community" is to be defined as having "the meaning set forth in the Preamble." Furthermore, the agreement defines "Development

- 8 -

Property" as having "the meaning set forth in the Preamble." Thus, the preamble is referred to in at least two important definitions in the operative provisions of the agreement. As a result, even under Pulte's asserted paradigm, the preamble to the Development and Acquisition Agreement would be capable of supporting a binding obligation.

Furthermore, the missing exhibit directly affects the issue that was a primary focus of litigation in this case: the intended size of the community which Pulte was to build to support the country club. Pulte contends that the exhibit was never meant to provide a scope for the development of the community. However, this supposition is precisely the point. In the absence of the exhibit itself, there is no way to know what the exhibit would have shown without reference to parol evidence. The agreement was not clear and unambiguous on this issue.

Pulte also argues that the agreement does not explicitly provide for a "guaranteed" number of homes in the community. While undoubtedly true, once the agreement was found to be ambiguous as to the scope of the development, it was for the trier of fact to determine what the intent of the parties had been on the issue. Pulte presented a strong case that it never intended to be bound to build a certain number of homes. The jury, however, rejected Pulte's assertions and instead found that Applecross had established that the parties had agreed that the community would consist of approximately 1,000 homes and included the Del Webb tract.

Therefore, we cannot conclude that the trial court erred in ruling that there was an ambiguity, that parol evidence would be admissible to address the ambiguity, and that the resolution of the ambiguity was for the jury. Pulte is not entitled to either JNOV or a new trial on this basis.

Next, Pulte argues that the trial court erred in permitting Applecross's economics experts, John E. Mitchell and Jeffrey R. Dugas, to testify as to their opinions on the lost profits suffered by Applecross pursuant to Pulte's breach of the agreement. Pulte contends that these experts' testimony was unreliable and lacking in foundation.

"[T]he admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *Commonwealth v. Fransen*, 42 A.3d 1100, 1106 (Pa. Super. 2012), (citation omitted). A trial court abuses its discretion if it misapplies the law or rules in a manner lacking reason. *See Commonwealth v. Rega*, 856 A.2d 1242, 1244 (Pa. Super. 2004).

Pulte focuses on its belief that the country club was a new business with no history of profitability. Thus, it believes that Mitchell's and Dugas's expert testimony was "speculative and not founded in fact." Appellant's Brief, at 51.

Lost profits are recoverable when, among other requirements not relevant here, their scope can be established with reasonable certainty. *See Quinn v. Bupp*, 955 A.2d 1014, 1021 (Pa. Super. 2008). Pulte contends

- 10 -

that Mitchell and Dugas based their opinions regarding lost profits on mere speculation from Applecross's principal, Bob Levy. "Speculative profits are those the evidence of which is so meager or uncertain as to afford no reasonable basis for inference." ***Birth Center v. St. Paul Cos., Inc.***, 727 A.2d 1144, 1162 (Pa. Super. 1999) (citation omitted).

Pulte's argument that the country club profits were speculative is premised on its belief that it was a "new business with no history of profitability." Appellant's Brief, at 52. New businesses face a higher burden in establishing lost profits, as they have no historical basis to establish profitability. ***See Delahanty v. First Pa. Bank, N.A***, 464 A.2d 1243, 1260 (Pa. Super. 1983). However, as a general rule, we do not require parties to prove damages with high standards of precision, but merely a reasonable level of certainty. ***See Smith v. Penbridge Assocs., Inc.***, 655 A.2d 1015, 1022 (Pa. Super. 1995). More importantly, we have consistently held that "the breaching party should not be allowed to shift the loss to the injured party when damages, even if uncertain in amount, were certainly the responsibility of the party in breach." ***Id***. (citations omitted).

Here, as a matter of logic, it is clear that the reduction in the number of homes that were required to purchase memberships in the country club and golf course caused some damage to Applecross's business. Indeed, Pulte's appraisal expert, Shaun Henry, opined that the reduction in the number of homes in the community reduced the value of the golf course by

$3,300,000. **See** N.T., 9/25/15, at 155-156. Thus, Applecross was not required to prove its lost profits damages to a mathematical certainty, but merely to a reasonable level of certainty.

In these circumstances, expert testimony is an appropriate form of proof. **See Bolus v. United Penn Bank**, 525 A.2d 1215, 1226 (Pa. Super. 1987).

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Pa.R.E. 703. Assertions of flaws in an expert's calculations "go[] only to weight jury should accord it and not to its admissibility." **Bolus**, 525 A.2d at 1226 (citation omitted).

Pulte's argument, at its core, is a complaint that Applecross's experts, Dugas and Mitchell, relied heavily upon numbers given to them by Applecross's principal, Levy. Pulte was given the opportunity to cross-examine Levy on how he arrived at these numbers. It was able to cross-examine Dugas and Mitchell regarding their reliance on Levy's numbers, and the extent and depth of their independent assessments on the issue of damages. Finally, as noted, Pulte had its own experts testify to their own opinions and to critique Levy's numbers as well as the methodology used by Dugas and Mitchell.

The trial court did not abuse its discretion in permitting Dugas and Mitchell to testify as to their opinions on the issue of damages. The flaws highlighted by Pulte were an issue for the jury to weigh in evaluating the credibility of the experts' opinions, and not grounds for finding Applecoss's experts' opinions inadmissible. Pulte's third issue on appeal therefore merits no relief.

In its final issue, Pulte argues that the trial court erred in failing to enforce a limitation on damages contained in the Development and Acquisition Agreement. Section 23.3 of the agreement is entitled "Event of Default by Seller," and provides, in relevant part:

> If [Pulte] fails to complete any Closing or perform any act required of [Pulte] hereunder, or otherwise is in breach of any of its representations or warranties or covenants hereunder in a material respect hereunder, then [Applecross] shall deliver to [Pulte] written notice of such default or breach and [Pulte] shall have a period of ten(10) days to cure such default … If such default or breach remains uncured beyond the cure period described above, …, [Applecross] shall be entitled to either (i) specific performance by [Pulte] or (ii) *if specific performance is not available, to terminate this Agreement in which event [Pulte] shall promptly reimburse [Applecross] for [Applecross's] actual out-of-pocket costs incurred in connection with this Agreement and the performance of [Applecross's] obligations hereunder, but in no event shall such amount exceed FIVE HUNDRED THOUSAND DOLLARS ($500,000)*.

(emphasis supplied). Pulte contends that this section acts to limit Applecross's claim for damages arising from any breach to a maximum of $500,000.

- 13 -

Applecross argues, and the trial court concluded, that section 23.3 is a provision that applies only to remedies for pre-closing breaches. Viewed in context of the entire agreement, this conclusion is compelling. However, we conclude that the language of the section itself defeats Pulte's argument.

Pulte's argument requires a strained reading of section 23.3. The highlighted language, which includes the $500,000 limitation, does not contain the term "damages" at all. Nor does it explicitly refer to lost profits. It refers solely to "actual out-of-pocket costs" borne by Applecross. It does not purport to limit any other form of damage, such as consequential or incidental, that Applecross might suffer. It therefore merely acts to limit Applecross's claim for damages based upon "out-of-pocket costs" to $500,000. Pulte's request was to reduce the entire award, which included lost profits, to $500,000. Pulte does not identify any amount of the jury's award which is traceable to "out-of-pocket costs." As such, we conclude that the trial court did not err in refusing to mold the verdict to $500,000.

Judgment affirmed. Jurisdiction relinquished.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/13/2017